IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

OHIO VALLEY ENVIRONMENTAL
COALITION, WEST VIRGINIA
HIGHLANDS CONSERVANCY,
and SIERRA CLUB,

       Plaintiffs,

v.                                  CIVIL ACTION NO. 2:13-21588

FOLA COAL COMPANY, LLC,

       Defendant.

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO FOLA'S MOTION FOR SUMMARY JUDGMENT

MICHAEL BECHER
JOSEPH M. LOVETT
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
(304) 645-9006

JAMES M. HECKER
Public Justice
1825 K Street, N.W. Suite 200
Washington, DC 20006
(202) 797-8600

Counsel for Plaintiffs

# Table of Contents

Introduction ........................................................................................................................ 1

I.     This Court Has Previously Rejected Seven of Fola's Arguments ......................... 2

     A.     Discharges of Ionic Pollutants Measured as Conductivity Are Actionable and Enforceable ............................................................................... 4

     B.     Fola's Permits Make Compliance With Water Quality Standards an Enforceable Condition ................................................................................ 5

     C.     Fola Cannot Collaterally Attack the Validity of Section 5.1.f and, in Any Event, that Section Is a Valid Part of West Virginia's NPDES Program ................ 7

     D.     WVDEP's Interpretation of SB 615 to Expand the Permit Shield Is Erroneous ...................................................................................................... 7

     E.     Evidence of Adverse Fish Impacts Is Not Necessary to Prove a Violation of Water Quality Standards, and WVSCI May Be Used to Prove a Violation ........................................................................................................ 8

     F.     Section 5.1.f Is Not Unenforceable Even If It Has Broader Coverage than Federal Requirements ................................................................................ 10

     G.     Imposing Liability Would Not Violate Fola's Due Process Rights ........................ 11

II.     Plaintiffs' CWA Claim Is Not Barred by HB 2283 or SB 357 ............................ 11

     A.     HB 2283 and SB 357 Are Not Effective Unless and Until They Are Approved by EPA .......................................................................................... 13

     B.     Even if HB 2283 and SB 357 Had Taken Effect,  Fola's Permit Cannot Be Modified by Them Unless and Until WVDEP Complies With Required Procedures for Modifying that Permit, Including a Draft Permit, Public Notice and Opportunity for Comment ................................................................. 14

     C.     Fola's Permit Condition Is Not Less Enforceable or More Modifiable Because It Incorporates § 5.1.f by Reference ......................................................... 15

     D.     HB 2283 and SB 357 Are Pre-empted Because They Conflict With the CWA ............................................................................................................. 16

         1.     SB 357's Automatic Permit Modification Rule Impermissibly Conflicts With CWA Rules Establishing Required Procedures for Permit Modifications ................................................................... 17

         2.     HB 2283 and SB 357 Impermissibly Conflict with the CWA's

Anti-Backsliding Provision ............................................................................ 17

III.    Plaintiffs' SMCRA Claim Is Not Barred by the CWA's Permit Shield or
SMCRA's Savings Clause and That Claim Provides an Alternative Basis for
Requiring Compliance With Water Quality Standards ........................................ 20

A.    This Court Lacks Jurisdiction to Consider Fola's Attack on Federal and
State SMCRA Performance Standards .................................................. 21

B.    Federal and State SMCRA Performance Standards Are Consistent with the
CWA ................................................................................................ 23

C.    Even if West Virginia's SMCRA Standard Were More Stringent than the
CWA, SMCRA's Savings Clause Does Not Prohibit More Stringent State
Performance Standards ...................................................................... 25

D.    If HB 2283 and SB 357 Had the Effect of Eliminating SMCRA's Federal
and State Performance Standards Requiring Compliance With Water
Quality Standards, then OSM's Approval, and EPA's Concurrence, Would
Be Required Before That Change Could Take Effect .............................. 27

E.    The Cases Cited by Fola Are Distinguishable or Wrongly Decided ....................... 28

IV.    Even if the Court Determined, Contrary to Parts I-III Above, that Plaintiffs' CWA
and SMCRA Claims Were Barred, Those Claims Are Co-extensive with
Plaintiffs' Alternative Theory Alleging Fola's Noncompliance with Its § 401
Certification, and the Court Should Grant Plaintiffs Leave to Amend and
Supplement Their Complaint to Add That Theory .............................................. 31

Conclusion ............................................................................................................. 33

**Introduction**

In this action, like several others before it, Plaintiffs seek to enforce the condition in WV/NPDES Permits that prohibits violations of West Virginia's EPA-approved water quality standards under the Clean Water Act (CWA).  Pursuant to that permit condition, and the regulation it incorporates by reference at 47 C.S.R. § 30-5.1.f, permittees must comply with West Virginia's narrative water quality standards.  Those standards prohibit industrial or other wastes "in any of the waters of the state" that cause or contribute to "[m]aterials in concentrations which are harmful, hazardous or toxic to man, animal or aquatic life" or "[a]ny other condition . . . which adversely alters the integrity of the waters of the State," and which further provide that "no significant adverse impact to the chemical, physical, hydrologic, or biological component of aquatic ecosystems shall be allowed."  47 C.S.R. §§ 3.2.e, 3.2.i.  Fola's three permits in this case each contain the permit condition requiring compliance with those standards.  Fola Mem. 19-20; Fola Ex. 1 at 16; Fola Ex. 2 at 13; Fola Ex. 3 at 20.

In its brief in support of its motion for summary judgment, Defendant Fola Coal Company, LLC (Fola) makes nine arguments that this permit condition is unenforceable.  Seven of Fola's arguments essentially repeat those that this Court has already considered and rejected in similar citizen suits brought by Plaintiffs.  The remaining two arguments are new or have not been previously addressed by this Court.

First, Fola has raised a new argument based on two recent statutes enacted by the West Virginia Legislature.  Mem. at 33-35.  The purpose of those statutes is to eliminate the NPDES permit condition upon which Plaintiffs rely in their CWA claim.  As explained below, however, Fola's reliance on those statutes is misplaced because (1) they have not yet taken effect; (2) the procedures that federal law requires as a precondition for permit modification have not yet occurred; and (3) the state statutes conflict with, and therefore are preempted by, federal law.

Second, Fola argues that if Plaintiffs' CWA claim is barred because by Fola's permit shield, then Plaintiffs cannot prevail on their SMCRA claims because of that statute's savings clause. Mem. at 39-42. If Plaintiffs' CWA claim is not dismissed, the Court need not address this issue. Since this Court has never dismissed that claim in any previous citizen suit, it has never had to address this issue. If the CWA claim is now dismissed, however, the CWA permit shield and SMCRA savings clause do not preclude Plaintiffs' SMCRA claim because (1) this Court lacks jurisdiction to consider Fola's challenge; (2) the SMCRA standards Plaintiffs seek to enforce are consistent with the CWA; (3), if HB 2283 and SB 357 had the effect of changing SMCRA performance standards, they cannot become effective without approval by the Office of Surface Mining and Reclamation Enforcement (OSM); and (4) even if those standards are more stringent than the CWA, they are not prohibited by SMCRA's savings clause.

Finally, even if Fola were to succeed in its arguments on Plaintiffs' existing CWA and SMCRA claims, Plaintiffs should be granted leave to supplement and amend their Complaint to add an alternative CWA theory that is consistent and co-extensive with the legal theory in their existing CWA and SMCRA claims. That alternative theory would still allow Plaintiffs to enforce Fola's compliance with narrative water quality standards.

## I.      This Court Has Previously Rejected Seven of Fola's Arguments

As Fola admits, this Court has allowed Plaintiffs to enforce 47 C.S.R. § 30-5.1.f in many past and pending citizen suits. Mem. at 3 n. 1. In those cases, this Court has rejected seven of the arguments Fola presents here. Instead of repeating the full arguments that Plaintiffs previously made in those cases, Plaintiffs will summarize their main points and this Court's holdings on each issue.

Before doing so, we emphasize that although an NPDES permit is issued by a state, its effect and enforceability is governed by federal law. West Virginia's authority to issue NPDES

permits began in 1982 when EPA approved West Virginia's NPDES permit program under

section 402 of the CWA. 33 U.S.C. § 1342; 47 Fed. Reg. 22363 (May 24, 1982).  West Virginia

must administer its NPDES program in compliance with federal standards.  *See* 33 U.S.C. §

1342(c)(2) ("Any State permit program under this section shall at all times be in accordance with

this section and guidelines promulgated" under the Act).  Thus, the meaning and enforceability

of NPDES permits are governed by federal, not state, law.  Under the Supremacy Clause of the

U.S. Constitution, federal law is controlling.

Section 303 of the CWA requires states to set water quality standards for all waters

within their boundaries.  33 U.S.C. § 1313(a)(3)(A); *Pronsolino v. Nastri*, 291 F.3d 1123, 1127

(9th Cir. 2002).  A water quality standard must include water quality criteria, which are specific

limits on pollutants which protect the designated uses for each water body and which may be

expressed as either a narrative standard or a numeric concentration level.  40 C.F.R. §§ 131.3(b),

131.6(c). Revised or new water quality standards do not become effective unless and until they

are reviewed and approved by EPA. 33 U.S.C. § 1313(c)(3).

After EPA approval, water quality standards become federal law.  In *Arkansas v.*

*Oklahoma*, 503 U.S. 91, 110 (1992), the Supreme Court recognized the "federal character" of

state pollution standards under the CWA.[1]  The Court construed an EPA regulation that required

CWA discharge permits to comply "with the applicable water quality requirements of all

affected States." 40 C.F.R. § 122.4(d). The Court held that "this regulation effectively

incorporates into federal law those state-law standards the Agency reasonably determines to be

'applicable'" and those standards "are part of the federal law of water pollution control." 503

---

[1]In *EPA v. Oklahoma*, decided together with *Arkansas v. Oklahoma*, the United States took the
position that "the showing necessary to determine under the CWA whether there is compliance
with any particular state [pollution] standard is itself *a matter of federal, not state, law*." Brief for
Petitioner, O.T. 1991, No. 90-1266, p. 18 n. 21 (emphasis added).

3

U.S. at 110.  As a result, effluent limitations based on those standards are federally enforceable by EPA or citizens in the federal courts.  *U.S. v. Smithfield Foods, Inc.*, 965 F. Supp. 769, 795-96 (E.D. Va. 1997); *PIRGIM Public Interest Lobby v. Dow Chemical Co.*, 1996 WL 903838, at *4 (E.D. Mich. 1996); *SPIRG v. P.D. Oil & Chemical Storage, Inc.*, 627 F. Supp. 1074, 1089 (D.N.J. 1986).

In the citizen suit provision of the CWA, Congress authorized citizens to enforce "an effluent standard or limitation," which Congress specifically defined to mean "a permit or condition thereof."  33 U.S.C. §§ 1365(a)(1)(A), (f)(6).  By this language, Congress authorized citizen enforcement of all permit conditions.  It did not limit citizen enforcement to numerical conditions in permits.  In this case, Plaintiffs are enforcing a condition in Fola's NPDES permits which requires compliance with 47 C.S.R. § 30-5.1.f, which in turn requires compliance with West Virginia's water quality standards.  One of those standards is 47 C.S.R. § 2-3.2, which prohibits discharges causing or materially contributing to chemical or biological impairment of aquatic life.  Plaintiffs' action is therefore supported by the plain language of the CWA.

### A.     Discharges of Ionic Pollutants Measured as Conductivity Are Actionable and Enforceable

Fola's first argument is that discharges of conductivity are not subject to regulation or enforcement under the CWA.  Mem. at 16-19.  This Court addressed that argument in *OVEC v. Fola Coal Co., LLC,* 2014 WL 4925492, at *3-*12 (S.D.W.Va. 2014).  This Court held that, "while conductivity may not generally be considered a pollutant, in this unique and well-studied region [of Appalachia], it is a reasonable proxy for specific ionic pollutants known to cause violations of West Virginia's narrative water quality standards." *Id.* at *12.  Those pollutants are the ionic mixture of sulfate, magnesium, calcium and bicarbonate in alkaline mine discharges,

which are measured as conductivity.  *Id.* at *4, *7-*9.[1]

The parties have stipulated in this case that Fola has discharged this same ionic mixture as alkaline mine drainage from its outlets at its three mines along Leatherwood Creek. Stipulation, Doc. 53, ¶s 13-18, 32-36, 46-48.  The stipulation contains many measurements of the four ions of sulfate, magnesium, calcium and bicarbonate discharged from Fola's outlets, as well as measurements of the high levels of conductivity in the discharges.  *Id.*  Discharges of this mixture of ionic pollutants (and conductivity as their proxy) are therefore actionable under the CWA and the measured discharges of these pollutants are sufficient to create a genuine issue of material fact for trial as to Fola's liability for these discharges.[2]

### B.  Fola's Permits Make Compliance With Water Quality Standards an Enforceable Condition

Fola's second argument is that it is shielded from liability by the permit shield in 33 U.S.C. § 1342(k).  Mem. at 19-25.  This Court rejected that argument in *OVEC v. Marfork Coal Co., Inc.*, 966 F. Supp. 2d 667, 682-86 (S.D.W.Va. 2013).  This Court held that § 1342(k) only shields a permittee when it is in compliance with all of the terms and conditions in its permit. "The federal permit shield, as explained by the Fourth Circuit in *Piney Run*, requires compliance with all conditions of a permit."  *Id.* at 680.

Fola's permits incorporate by reference a regulation prohibiting its discharges from

---

[1] Plaintiffs' complaint adequately alleged that Fola has discharged pollutants in the form of dissolved solids such as sulfate that, because of their ionic strength, cause increased conductivity and biological impairment.  Complaint, ¶s 38-43, 49, Doc. 1.

[2] Fola cites no authority for its argument that Plaintiffs cannot rely on a mixture of ions, and instead must identify which of the specific ionic chemicals discharged by Fola are primarily responsible for causing the biological impairment.  Mem. at 18.  This Court rejected that argument in *Fola*, noting that Plaintiffs presenting sufficient evidence to defeat a motion for judgment on partial findings even though Plaintiffs' expert reached her conclusion on causation "without specific measurements from Stillhouse Branch of each of the four constituent ions known to be characteristic of similarly affected waters in this region."  2014 WL 4925492, at *11.

causing violations of water quality standards.  47 C.S.R. § 30-5.1.f.  This Court held in *Marfork,* as well as in five other citizen suits, that § 5.1.f is an enforceable permit condition.  *Marfork*, 966 F. Supp. 2d at 985; *Fola*, 2013 WL 6709957, at *11; *OVEC v. Consol of Kentucky, Inc.*, 2014 WL 1761938, at *3 (S.D.W.Va. 2014); *OVEC v. Alex Energy, Inc.*, 34 F. Supp. 3d 632, 637 (S.D.W.Va. 2014); *OVEC v. Elk Run Coal Company, Inc*., 24 F. Supp. 3d 532, 537 (S.D.W.Va. 2014); *OVEC v. Fola Coal Co., LLC,* 2015 WL 362643, at *1 (S.D.W.Va. 2015).  The permit shield therefore "explicitly authorizes the discharge of [pollutants] *only to the extent that it does not cause a violation of water quality standards.*"  *Marfork*, 966 F. Supp. 2d at 685 (emphasis added).  Since Plaintiffs allege violations of those standards, the shield is inapplicable.

Fola argues that the "structure and organization" of its permit does not support treating water quality standards as directly enforceable, because the permit does not require monitoring or reporting of unlisted pollutants and contemplates that evidence of noncompliance with water quality standards can only be used by WVDEP to modify its permit.  Mem. at 21-23.  However, this Court held in *Marfork* that § 5.1.f is unambiguous and must be enforced according to its plain meaning.  966 F. Supp. 2d at 682-83.[3]

Fola also speculates that the Fourth Circuit would not follow the Ninth Circuit's holding in *Northwest Environmental Advocates v. City of Portland,* 56 F.3d 979, 981 (9th Cir. 1995), that citizen suits may be brought to enforce an NPDES permit condition requiring compliance with water quality standards.  Mem. at 24-25.  While the Fourth Circuit has not yet directly addressed that issue, it has allowed citizens to enforce a narrative NPDES permit condition requiring

---

[3] The idea that permittees should have to comply with a narrative condition prohibiting violations of water quality standards is neither novel nor unusual.  In addition to West Virginia, Oregon, California and Georgia have imposed this same narrative condition in NPDES permits, and the courts have enforced it.  *Portland*, 56 F.3d at 985; *Bldg. Indus. Ass'n of San Diego Cnty. v. State Water Res. Control Bd.*, 124 Cal. App. 4th 866, 880 n. 10 (2004); *New Manchester Resort & Golf, LLC v. Douglasville Dev., LLC*, 734 F. Supp. 2d 1326, 1337 (N.D.Ga. 2010).

reporting of monitoring results under the CWA. *Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109, 1115 (4th Cir. 1988) ("Simkins' reporting requirements are expressly made conditions of its permit, and therefore violations of these conditions, by operation of § 1365(f)(6), are violations of an effluent standard or limitation of § 1365(a)"). Furthermore, the Fourth Circuit recently refused to certify the issue of the enforceability of § 5.1.f. for interlocutory appeal. *OVEC v. Elk Run Mining Co.*, Civil No. 3:12-0785, Oct. 24, 2014 Order, Doc. 135. In any event, this Court has repeatedly held that § 5.1.f is enforceable in a CWA citizen suit.

### C. Fola Cannot Collaterally Attack the Validity of Section 5.1.f and, in Any Event, that Section Is a Valid Part of West Virginia's NPDES Program

Fola's third argument is that 47 C.S.R. § 30-5.1.f was never properly approved as a part of West Virginia's NPDES program. Mem. at 26-31. This Court rejected that argument in *OVEC v. Fola Coal Co., LLC*, 2013 WL 6709957, at *11-*21 (S.D.W. Va. Dec. 19, 2013), for two reasons. First, the Court held that this argument is an impermissible collateral attack on Fola's NPDES permit. *Id.* at *12-*15. Second, the Court held that "the original promulgation of this rule was most likely done in a proper manner which made the rule enforceable," and that, "even if the promulgation of the original version of § 47-30-5.1.f was improper for some reason, that defect has been cured by subsequent repromulgation." *Id.* at *15, *20. Consequently, that section "is a valid rule and results in an explicit and enforceable condition of Defendant's WV/NPDES permits." *Id.* at 21.

### D. WVDEP's Interpretation of SB 615 to Expand the Permit Shield Is Erroneous

Fola's fourth argument is that WVDEP's interpretation of SB 615 expands the scope of the permit shield to prevent Fola's liability. Mem. at 31-33. This Court rejected that argument in *Marfork*. 966 F. Supp. 2d at 677-82. Fola acknowledges that "this Court has previously concluded that neither SB 615 nor WVDEP's rulemaking had any real effect." Mem. at 33.

   E.     **Evidence of Adverse Fish Impacts Is Not Necessary to Prove a Violation of Water Quality Standards, and WVSCI May Be Used to Prove a Violation**

Fola's fifth argument relates to the type of evidence needed to prove a violation of the narrative water quality standard in 47 C.S.R. § 2-3.  Fola argues that Plaintiffs "rely solely on WVSCI scores to prove violations" of that standard, and that WVSCI cannot be used to define compliance with the standard because it has never been promulgated by the state or EPA as a rule and has not undergone public notice and comment.  Mem. at 35-36.  This argument is flawed for two reasons.

First, Plaintiffs do not rely solely on WVSCI scores to prove a violation.  *See Elk Run,* 24 F. Supp. 3d at 550, n. 10 ("Regardless, Plaintiffs present more than simply stand-alone WVSCI scores in this case"); *Fola,* 2014 WL 4925492, at *20 ("Plaintiffs have presented evidence [of impairment] . . . through a variety of methods and examining a range of data"); *Fola,* 2015 WL 362643, at *20 ("[t]here is simply no evidence of another land use activity . . . [other than Fola's mine] that could account for the significantly altered state of Stillhouse Branch").  Plaintiffs rely on WVSCI scores and other evidence related to biological impairment, including (1) site-specific measurements of outlet discharge and stream chemistry, including total dissolved solids, sulfate, magnesium, bicarbonate, calcium, pH, alkalinity, and conductivity, (2) site-specific sampling and assessment of the abundance and diversity of the benthic species in the stream, including taxonomic changes of intolerant taxa over time in response to mining and the use of WVSCI and GLIMPSS scores, (3) site-specific assessment of stream habitat using a rapid bioassessment protocol; (4) the EPA Benchmark and numerous scientific studies showing the relationships among mining intensity, stream biology and chemistry, and stream impairment in Appalachian ecoregions; (5) WVDEP's § 303(d) list of impaired streams; (6) the land uses in the specific watershed; and (7) the scientific opinions of Plaintiffs' expert biologists based on their

experience, site visits, and all of the studies and evidence.  See Stipulation, Doc. 53; Swan

Report, Doc. 64-1; Palmer Report, Pl. Ex. 1; Baker Report, Pl. Ex. 2; WVDEP § 303(d) List,

Doc. 64-2; *Elk Run,* 24 F. Supp. 3d at 556-79; *Fola,* 2014 WL 4925492, at *4-*12; *Fola,* 2015

WL 362643 at *5-*22.

Second, EPA rejected Fola's argument about rulemaking when it responded to public

comments on its disapproval of WVDEP's 2012 § 303(d) List.   The West Virginia Coal Ass'n

objected to the use of WVSCI to measure compliance with 47 C.S.R. § 3.2(e) & (i) because it

was never promulgated as a rule.  EPA, Sept. 30, 2013 Letter, Enclosure 2, at 12, Pl. Ex. 3.  EPA

stated that "WVSCI is not an applicable water quality standard and has not been treated as such

by EPA."  *Id.* at 13.  EPA explained that:

> All Region III states have developed assessment methodologies that allow them to
> compare instream conditions to applicable narrative criteria. Like WVSCI, these
> assessment methodologies are not themselves water quality standards, but rather a means
> to allow states to assess whether narrative water quality standards are being achieved.
> Unlike water quality standards, EPA does not approve or disapprove assessment
> methodologies, but rather reviews the Section 303(d) list to ensure that there is a sound
> scientific basis for including or excluding certain waters.

*Id.*[4]  Furthermore, WVDEP's own guidance states that WVSCI "was specifically designed for

assessment of the biological component of the 47 C.S.R. § 3.2."  *Elk Run,* 24 F. Supp. 2d at 543,

quoting WVDEP, Justification and Background for Permitting Guidance for Surface Coal

Mining Operations to Protect West Virginia's Narrative Water Quality Standards, 47 C.S.R. 2 §§

3.2.e and 3.2.i (2010), at 4.  Thus, as this Court held in both *Elk Run* and *Fola,* the WVSCI

methodology, and the WVSCI cutoff score of 68 specifically, can be used to determine

---

[4] The case Fola cites supports this conclusion.  Mem. at 36.  In *Florida Wildlife Federation v. McCarthy,* 2015 WL 1189946, at *1, the court stated that, although EPA must approve state water quality standards, "a state retains discretion to enact and to enforce—without EPA's review and approval—both a method of identifying impaired waters and an antidegradation policy."  The WVSCI is "a method of identifying impaired waters" and therefore does not require EPA approval or rulemaking.

compliance with 47 C.S.R. § 3.2. *Elk Run,* 24 F. Supp. 2d at 550, 556; *Fola,* 2015 WL 362643, at *2.

Furthermore, Plaintiffs are enforcing the water quality standard in 47 C.S.R. § 2-3.2. Fola does not argue that it is invalid. Even if the WVSCI had to be promulgated as a rule (and was not), the narrative standard in 47 C.S.R. § 3.2 is a valid rule, is enforceable through Fola's permit condition, and prohibits biological impairment. The WVSCI and other evidence can be used to assess that impairment and to determine compliance. *Elk Run,* 24 F.3d at 550-51, 556.

Fola also argues, based on H.R. Con. Res. 111 (2010) and S.B. 562 (2012), that evidence of adverse fish impacts is necessary to prove a violation of 47 C.S.R. § 3.2. Mem. at 10, 36-37. This Court rejected that argument in *Elk Run,* 24 F. Supp. 3d at 548-54. The Court held that the 2010 legislative resolution that attempted to modify that standard to require fish impacts had no legal effect, and that S.B. 562 did not modify the standard either. *Id.* at 553. The Court also held that the plain language of 47 C.S.R. § 3.2 "does *not* require proof of effects on fish in order to find a violation." *Id.* (emphasis in original).

### F.     Section 5.1.f Is Not Unenforceable Even If It Has Broader Coverage than Federal Requirements

Fola's sixth argument is that 47 C.S.R. § 30-5.1.f is unenforceable because it has broader coverage than federal requirements. Mem. at 37-38. Plaintiffs do not agree that § 5.1.f. is broader, but even if it were, Fola's argument is erroneous. To support its argument, Fola relies on a statement in *Atlantic States Legal Foundation v. Eastman Kodak Co.,* 12 F.3d 353, 359 (2d Cir. 1993), that state regulations and permits "which mandate 'a greater scope of coverage than that required' by the federal CWA and its implementing regulations are not enforceable through a citizen suit under 33 U.S.C. § 1365." This Court quoted and expressly rejected that holding in *Fola,* stating that it "has not been adopted in the Fourth Circuit and this Court rejects its

10

reasoning." 2013 WL 6709957, at *18. The Court explained that *Kodak* is inconsistent with decisions in the Ninth and Eleventh Circuits, with the Fourth Circuit's decision in *Piney Run,* and with the CWA's requirement that permittees comply with "any more stringent limitation" under state law. *Id.* at *18-*19; 33 U.S.C. § 1311(b)(1)(C). Consequently, citizens may enforce permit conditions even if they are more stringent than federal standards.

### G.  Imposing Liability Would Not Violate Fola's Due Process Rights

Fola's seventh argument is that imposing liability in this case would violate its due process rights, because it did not have "fair warning" that it could be liable for violating the CWA "by discharging pollutants not expressly identified and limited in their permits." Mem. at 38-39. This Court rejected that argument in *OVEC v. Elk Run Coal Co.*, 2014 WL 29562, at *10 (S.D.W. Va. Jan. 3, 2014), holding that "the permit condition and § 47-30-5.1.f. itself, are both unambiguous in imposing liability upon [permittees] in the event that they violate water quality standards through discharges under their permits," and that permittees "have had notice of the possibility of civil liability since the predecessor to § 47-30-5.1.f first became effective in 1985" or, at the least, since their permits were issued.

## II.  Plaintiffs' CWA Claim Is Not Barred by HB 2283 or SB 357

Having addressed Fola's seven arguments that this Court has already rejected, we turn next to Fola's other arguments, which consume the small remainder of its brief. Mem. at 33-35, 39-42. Those arguments raise multiple issues and require a longer response.

Fola relies on two new statutes that attempt to eliminate the enforceability of 47 C.S.R. § 30-5.1.f. Mem. at 33-35. The first statute, HB 2283, approved a change to WVDEP's regulations that deleted the part of that section which requires discharges regulated by WV/NPDES permits for coal mines to "be of such quality so as not to cause violation of applicable water quality standards." *Id.* at 34. HB 2283, ¶ (i). HB 2283 was approved by the

11

Governor on March 31, 2015.

The second statute, SB 357, amends W.V. Code § 22-11-6, which requires compliance with state water quality standards, to provide that "water quality standards themselves shall not be considered 'effluent standards or limitations' for the purposes of both this article and sections 309 and 505 of the federal Water Pollution Control Act and shall not be independently or directly enforced or implemented except through the development of terms and conditions of a permit issued pursuant to this article."  SB 357, p. 23.  The bill further states that this provision is "intended to apply to all existing and future discharges and permits without the need for permit modifications."  SB 357, p. 23.  SB 357 also amends W.V. Code § 22-11-8 to provide that "water quality standards themselves shall not be incorporated wholesale either expressly or by reference as effluent standards or limitations in a permit issued pursuant to this article."  *Id*. at 25.  SB 357 was approved by the Governor on March 12, 2015 and becomes effective on June 1, 2015.  Thus, SB 357 purports to prohibit citizen enforcement of a narrative water quality standard unless it is translated by WVDEP into a specific permit limit or condition.

The two state laws at issue here—HB 2283 and SB 357—do not bar plaintiffs' CWA claim for three reasons.  First, these laws have no effect on this lawsuit because they have not yet taken effect under federal law.  They can become effective as federal law only if EPA approves the changes they make to West Virginia's NPDES program.  Second, even if EPA approves them, the existing condition in Fola's permit relied on by Plaintiffs remains remains in effect and is still federally enforceable until it is modified in accordance with required federal procedures.  Third, HB 2283 and SB 357 cannot automatically modify Fola's NPDES permit because that would conflict with required federal procedures for permit modifications, and they cannot remove the existing permit condition requiring compliance with water quality standards because

that would conflict with the anti-backsliding provision in § 402(o)(3) of the CWA.  Thus, those statutes are less stringent than the CWA requires in those two respects and, as a result, are pre-empted by federal law to that extent.

### A.  HB 2283 and SB 357 Are Not Effective Unless and Until They Are Approved by EPA

The first reason the state statutes relied on by Fola have no relevance is because they have not yet taken effect under federal law; as a result, these laws—even if there were valid (and they are not)—have no bearing here.

West Virginia's State NPDES program currently requires all coal mining permittees to comply with water quality standards, including narrative standards.  47 C.S.R. § 30-5.1.f.  EPA approved that programmatic requirement in 1985.  50 Fed. Reg. 28202 (July 11, 1985).  This Court has held that this permit condition is federally enforceable in a CWA citizen suit. *Marfork,* 966 F. Supp. 2d at 683-85.  Under Fola's interpretation, HB 2283 and SB 357 would eliminate that requirement and would therefore constitute a revision to the state program.  *Id.* at 689, n. 8 ("had the West Virginia Legislature eliminated the rule requiring compliance with water quality standards, . . . [that] would also constitute a revision to West Virginia's approved NPDES program. Such revisions generally are not effective unless and until approved by EPA.").

Under the Clean Water Act, revisions to state programs are governed by 40 C.F.R. § 123.62.  A revision includes any modification to state programs.  "As a matter of plain English usage, the term revision encompasses <u>any modification</u> in the requirements of a plan . . ." *Concerned Citizens of Bridesburg v. U.S. E.P.A.*, 836 F.2d 777, 785 (3d Cir. 1987) (emphasis added) (interpreting the similar requirement in the federal Clean Air Act).  Importantly, a revision to a state NPDES program is not effective unless and until the revision is approved by

EPA.  40 C.F.R. § 123.62(b)(4).

In this case, Fola does not claim that EPA has approved HB 2283 or SB 357, so the existing rule and permit condition are still in effect and are federally enforceable in this case. Because the permit still stands, Fola's motion is—at best—premature.

### B. Even if HB 2283 and SB 357 Had Taken Effect,  Fola's Permit Cannot Be Modified by Them Unless and Until WVDEP Complies With Required Procedures for Modifying that Permit, Including a Draft Permit, Public Notice and Opportunity for Comment

Even if HB 2283 and SB 357 had already taken effect, they would have no bearing here because Fola's permits cannot be modified without following required federal procedures for permit modifications.  A permit modification based on new standards or regulations is a major modification.  40 C.F.R. § 122.62(a)(3); *Sierra Club v. Powellton Coal Co., LLC*, 2010 WL 454929, at *16 (S.D.W.Va. 2010).  That federal rule applies directly to state NPDES programs. *Id.,* § 123.25(a)(22).  West Virginia has adopted essentially the same rule that a modification based on new regulations is major.  *See* 47 C.S.R. § 30-8.2.c.2.C.  Consequently, if, as a result of a new law or regulation, WVDEP proposes to eliminate a permit condition requiring compliance with water quality standards, then that is a major permit modification.  And, under applicable federal rules, a major modification is not effective unless a draft permit is issued and subjected to public notice and opportunity for comment.  40 C.F.R. §§ 122.62, 124.10.  WVDEP applies this same rule under its state regulations.  47 C.S.R. §§ 30-8.2, 30-10.1, & 30-10.2.

Those required procedures have not yet occurred in this case.  This Court has held that a "modification to a permit will not prevent a citizen suit action on the terms of the underlying permit if that modification does not comport with proper procedure."  *OVEC v. Apogee Coal Co.*, 555 F. Supp. 2d 640, 645 (S.D.W.Va. 2008).  "If the modification orders do not comply with the requisite procedures, they are defective and citizen suits may proceed based on the terms

of an original permit." *Powellton,* 2010 WL 454929, at *16.  Consequently, Plaintiffs can still

enforce the terms of Fola's existing, unmodified NPDES permits that contain the permit

condition requiring compliance with water quality standards.

### C.  Fola's Permit Condition Is Not Less Enforceable or More Modifiable Because It Incorporates § 5.1.f by Reference

EPA's NPDES regulations expressly endorse the incorporation of conditions into

NPDESpermits "either expressly or by reference."  40 C.F.R. § 122.41.  The permit condition at

issue here has the same force as any other permit condition.

Furthermore, Fola's permit cannot be modified simply by changing the regulation

independently from the permit.  Once the permit incorporated the regulation, the two formed a

single document—the permit—and that permit can only be modified by following required

procedures.  NPDES permits are interpreted "using the principles of contract interpretation."

*Marfork,* 966 F. Supp. 2d at 682.  Once a contract, or in this case a permit, "refers to another

document, that other document, or the portion to which reference is made, becomes

constructively a part of the writing, and in that respect the two form a single instrument."  11

Williston on Contracts § 30:25 (4th ed. 2013); *accord, State* ex rel *U-Haul Co, of W.Va. v.

Zakaib,* 752 S.E.2d 586, 595 (W.Va. 2013).  *See also Cunha v. Ward Foods, Inc.*, 804 F.2d 1418,

1428 (9th Cir. 1986) ("When a document incorporates outside material by reference, the subject

matter to which it refers becomes a part of the incorporating document just as if it were set out in

full.").  When the document being incorporated by reference is a regulation, "that regulation

becomes part of the contract for the indicated purposes as if the words of that regulation were set

out in full in the contract."  *U.S. v. Ins. Co. of N. Amer.*, 131 F.3d 1037, 1042 (D.C. Cir. 1997).

*Accord,* 11 Williston on Contracts § 30:19 (4th ed. 2013).  Consequently, Fola's permit currently

incorporates the language of 47 C.S.R. § 30-5.1.f as if the regulation was written therein, and the

Legislature's change to the regulation, by itself, cannot change the permit.

### D.   HB 2283 and SB 357 Are Pre-empted Because They Conflict With the CWA

Even if HB 2283 and SB 357 were in effect, the application of those new laws to the present case would be pre-empted by federal law.  Under conflict pre-emption, "even if Congress has not occupied the field, state law is nevertheless pre-empted to the extent it actually conflicts with federal law."  *California v. ARC Am. Corp.,* 490 U.S. 93, 100 (1989).  Conflict pre-emption occurs if "compliance with both federal and state regulations is a physical impossibility."  *Fla. Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142-43 (1963).  Further, conflict pre-emption occurs when any state law "stands an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hines v. Davidson*, 312 U.S. 52, 67 (1941).

West Virginia must administer its NPDES program "at all times" in compliance with federal standards.  33 U.S.C. § 1342(c)(2).  Section 510 of the CWA provides that a state "may not adopt or enforce any . . . limitation . . . which is less stringent than the . . . limitation . . . under this chapter."  33 U.S.C. § 1370.  Congress intended the "not-less-stringent" test in that section to be used to determine if a state rule or policy impermissibly conflicts with the CWA.  *Cf. General Mills v. Jones*, 530 F.2d 1317, 1325 (9th Cir. 1975) ("The 'not less stringent' test of 15 U.S.C. § 1461 is one test for determining whether impermissible conflict exists, and it is a test specifically intended by Congress for use in this situation").

Thus, States "may not set standards that are less stringent than the CWA's."  *Dubois v. U.S. Dept. of Agriculture*, 102 F.3d 1273, 1300 (1st Cir. 1996).  "If a state seeks to approve a standard that is less stringent than the federal CWA's floor, or seeks to apply a standard in a way that is otherwise invalid under federal law, then federal agencies and federal courts are obligated to resolve the application of the federal CWA in any case that properly comes before them."  *Id*.  If the state "does impose a less stringent standard, the federal law prevails."  *Northern Plains*

*Resource Council v. Fidelity Exploration and Development Co.*, 325 F.3d 1155, 1165 (9th Cir. 2003) ("it cannot possibly be urged that Montana state law in itself can contradict or limit the scope of the CWA, for that would run squarely afoul of our Constitution's Supremacy Clause"); *Kentucky Resources Council, Inc. v. EPA*, 304 F. Supp. 2d 920, 926 (W.D. Ky. 2004) (interpreting similar provision of the federal Clean Air Act). Here, HB 2283 and SB 357 are less stringent than, and impermissibly conflict with, the CWA in two respects.

1.   **SB 357's Automatic Permit Modification Rule Impermissibly Conflicts With CWA Rules Establishing Required Procedures for Permit Modifications**

SB 357 is less stringent than, and therefore impermissibly conflicts with, CWA regulations concerning permit modifications. SB 357 purports to apply to all existing NPDES permits "without the need for permit modifications." SB 357, p. 23. That provision conflicts with the CWA regulations cited in Part II.B. above, which require permit modifications to be preceded by draft permits, public notice, and opportunity for comment. A state law cannot override a federal rule. Federal rules issued by agencies have "no less preemptive effect than federal statutes." *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984). Thus, SB 357's automatic modification rule without a draft rule, public notice, or public comment is less stringent than the federal rule that requires those procedures. Therefore, the less stringent rule in SB 357 is pre-empted by Section 510 of the CWA.

2.   **HB 2283 and SB 357 Impermissibly Conflict with the CWA's Anti-Backsliding Provision**

Section 402(o) of the CWA, the "anti-backsliding" provision, limits modifications of permit limitations and conditions that are based on water quality standards. Section 402(o)(3) provides that: "In no event may such a permit to discharge into waters be renewed, reissued, or modified to contain a less stringent effluent limitation if the implementation of such limitation

17

would result in a violation of a water quality standard under section 303 of this title applicable to

such waters."  33 U.S.C. § 1342(o)(3).  EPA has stated that this section "acts as a floor, by

restricting the extent to which water-quality based permit limitations may be relaxed."  EPA,

Interim Guidance on Implementation of Section 402(o) Anti-backsliding Rules for Water

Quality-Based Permits, at 8 (available at http://www.epa.gov/npdes/pubs/owm0231.pdf.).  EPA

has also described that section as "a 'safety clause' that provides an absolute limitation on

backsliding."  EPA, Permit Writers Manual, p. 7-4 (2010) (available at

http://water.epa.gov/polwaste/npdes/basics/upload/pwm_chapt_07.pdf.).  EPA's permit manual

and rule on anti-backsliding make it clear that anti-backsliding applies not only to effluent

limitations, but also to "standards or conditions" contained in existing permits.  *Id.* at 7-4; 40

C.F.R. § 122.44(l)(1).  Thus, this section prohibits West Virginia from modifying and weakening

any condition in an NPDES permit if the modification would allow the permittee to violate state

water quality standards.

Here, Fola's NPDES permit has for many years contained a condition requiring Fola's

discharges to comply with narrative water quality standards.  Fola is violating those standards,

because it is discharging high levels of ionic pollution and conductivity and the downstream

sections of Leatherwood Creek.  See Stipulation, Doc. 53.  Plaintiffs' experts have measured

diversity and abundance of aquatic life downstream from Fola's discharges and found that the

downstream reaches have West Virginia Stream Condition Index (WVSCI) scores below 68,

which is the threshold for biological non-impairment.  Palmer Report, pp. 9-10, 19-21, 29, Pl.

Ex. 1.  WVDEP has listed the entire Leatherwood Creek under § 303(d) of the CWA as

biologically impaired.  *Id.* at 3-4.  Plaintiffs' biological experts will testify that Fola's discharges

cause or materially contribute to this impairment, in violation of the narrative standards in 47

C.S.R. §§ 3.2.e and 3.2.i.  Palmer Report, Pl. Ex. 1; Baker Report, Pl. Ex. 2.  This is the same type of evidence that this Court has found, in two recent cases, to support a violation of the narrative water quality standard for biological integrity.  *Elk Run,* 24 F. Supp. 2d 532; *Fola,* 2015 WL 362643.

In these circumstances, Section 402(o)(3) pre-empts any action by WVDEP to modify Fola's NPDES permits to include a less stringent permit condition that allows Fola to backslide and violate water quality standards.  HB 2283 and SB 317 are in direct conflict with Section 402(o)(3).  They direct WVDEP to modify any permit that contains a condition requiring compliance with water quality standards and prohibit WVDEP from incorporating any water quality standard into a permit by reference, even if that would result in a violation of water quality standards.  Section 402(o)(3) pre-empts any permit modification that falls beneath the "floor"—i.e., the current standard in § 5.1.f.  The floor is breached if the modified permit condition is less stringent than the existing permit condition and results in a violation of water quality standards.  That is true here.  Fola's existing permits prohibit a violation of water quality standards and, if Fola's permits were modified by HB 2283 and SB 357, they would not.

Those statutes therefore stand as obstacles to the accomplishment and execution of the CWA's purpose in Section 402(o)(3).  It is physically impossible to remove the condition requiring Fola to comply with water quality standards without resulting in a violation of water quality standards, because Fola is already in violation of those standards and the modified permit contains nothing to prevent that violation from continuing.  The modified permits would contain no limits on the ionic pollution and conductivity that Fola is discharging, and that pollution is causing or materially contributing to biological impairment of West Virginia streams.

Indeed, the whole purpose of HB 2283 and SB 317 is to prevent Plaintiffs from enforcing

19

those standards and to immunize coal mines from their ongoing violations of water quality

standards.  The West Virginia Coal Association lobbying guide that it gave to the West

Legislature this year explained that:

> This provision [47 C.S.R. § 30-5.1.f] has provided an opportunity for citizen's suits in
> federal court seeking CWA penalties for exceedences of water quality standards without
> corresponding NPDES effluent violations.  Recently, it has been used by anti-mining
> groups as an avenue to bypass the state's interpretation of its narrative standard and
> positioned a federal court to interpret the narrative criteria as requiring the imposition and
> compliance with a conductivity/TDS effluent limit.  The proposed rule change clarifies
> earlier attempts to address this problem that were ignored by the federal court as lacking
> clarity.

West Virginia Coal Ass'n, WV Coal Legislative Program (2015), at 7, Pl. Ex. 4.

Because the application of HB 2283 and SB 357 to Fola's permits would make them

less stringent and allow a violation of water quality standards, those statutes conflict with, and

are pre-empted by, federal law.  Citizens can enforce the anti-backsliding provision against an

NPDES permittee in a citizen suit by blocking the effectiveness of a permit modification that is

inconsistent with that provision.  *Citizens for a Better Environment-California v. Union Oil Co.,*

83 F.3d 1111, 1119-20 (9th Cir. 1996); *Public Interest Research Group of New Jersey v. New

Jersey Expressway Authority*, 822 F. Supp. 174, 185 (D.N.J. 1992).  Consequently, HB 2283 and

SB 357 cannot legally modify Fola's permits and compliance with the CWA must be measured

according to the original permits.

### III.   Plaintiffs' SMCRA Claim Is Not Barred by the CWA's Permit Shield or SMCRA's Savings Clause and That Claim Provides an Alternative Basis for Requiring Compliance With Water Quality Standards

Fola argues that if Plaintiffs cannot succeed on their CWA claim because of Fola's permit

shield arguments, then Plaintiffs cannot prevail on their SMCRA claims because of that statute's

savings clause.  Mem. at 39-42.  If Plaintiffs' CWA claim is not dismissed, the Court need not

address this issue.  If the CWA claim is dismissed, however, the CWA permit shield and

SMCRA savings clause do not preclude Plaintiffs' SMCRA claim.

The savings clause of SMCRA—Section 702(a)—provides, in relevant part, that "[n]othing in this chapter shall be construed as superseding, amending, modifying, or repealing" the CWA. 30 U.S.C. § 1292(a). This clause does not prohibit Plaintiffs' SMCRA claims, for five reasons. First, this Court lacks jurisdiction to consider Fola's challenge. Second, the SMCRA standards Plaintiffs seek to enforce are consistent with the CWA. Third, even if those standards are more stringent than the CWA, they are not prohibited by SMCRA's savings clause. Fourth, if HB 2283 and SB 357 had the effect of changing SMCRA performance standards, they cannot become effective without approval by the Office of Surface Mining and Reclamation Enforcement (OSM). Fifth, the cases relied on by Fola are distinguishable or wrongly decided.

### A.    This Court Lacks Jurisdiction to Consider Fola's Attack on Federal and State SMCRA Performance Standards

Fola challenges the validity of the federal and state performance standards that Plaintiffs seek to enforce in this case. Those standards require SMCRA permittees to comply with state water quality standards and to construct and operate adequate treatment facilities to ensure such compliance. 30 C.F.R. § 816.42; 38 C.S.R. § 2-14.5. Fola contends that these standards conflict with SMCRA's savings clause and are unenforceable.

This Court has no jurisdiction to consider that challenge. OSM approved the federal standard in 1982. 30 C.F.R. § 816.42, *approved*, 47 Fed. Reg. 47216 (Oct. 22, 1982). OSM stated that this rule provides "that discharges must comply with all State and Federal water quality laws and regulations. This includes applicable water quality standards." *Id*. at 47220. SMCRA provides that regulations on environmental protection standards cannot be approved by OSM unless it has "obtained the written concurrence" of EPA "with respect to those aspects" of federal regulations "which relate to air or water quality standards promulgated under the" Clean

Water and Clean Air Acts.  30 U.S.C. § 1251(b).  When it enacted this section, Congress was concerned about direct conflicts between air or water quality standards, and it believed that the EPA concurrence procedure would be sufficient to address such conflicts.  *See* H. Rep. No. 218, 95th Cong., 1st Sess. 142 (1977).  When OSM issued § 816.42 in 1982, EPA expressly "concurred in the issuance of this regulation."  *Id*. at 4722.

OSM also threatened to terminate West Virginia's state SMCRA program by "June 15, 1982, unless West Virginia submits by that date copies of enacted regulations requiring that all water leaving the permit area meet Federal and State water quality statutes, regulations, standards or effluent limitations."  47 Fed. Reg. 20119, 20122 (May 18, 1982).  In September 1982, after West Virginia submitted "regulations to require that water leaving the permit area will meet all applicable Federal and State water quality standards for the river, stream or drainway into which it is discharged," OSM removed that threat and approved that portion of West Virginia's program.  47 Fed. Reg. 39821 (Sept. 10, 1982).  EPA concurred that these West Virginia regulations were consistent with the CWA.  *Id*. at 39822; *see also* 50 Fed. Reg. 28324, 28337 (July 11, 1985) ("EPA concluded that the West Virginia program demonstrates the legal authority, administrative capability, and technical conformity to the Federal regulations necessary to maintain water quality standards promulgated under the authority of the Clean Water Act").

OSM's 1982 action approving a national rule is subject to judicial review *only* in the U.S. District Court for the D.C. Circuit.  30 U.S.C. § 1276(a)(1); *Com. of Va. ex rel. Virginia Dep't of Conservation & Econ. Dev. v. Watt*, 741 F.2d 37, 40 (4th Cir. 1984) ("under the SMCRA an action which constituted even an indirect attack on a federal regulation, could be brought only in the district court for the District of Columbia").  Such a challenge must be filed "within sixty

22

days from the date of such action, or after such date if the petition is based solely on grounds arising after the sixtieth day." *Id.* OSM's 1985 action approving West Virginia's state program is subject to judicial review in this Court, but is subject to the same sixty-day time limit. 30 U.S.C. § 1276(a)(1). This Court has held that Fola's claims arose when "the water quality standards provision became effective in 1985." *Fola*, 2013 WL 6709957, at *13.[5]

OSM approved the federal rule in 1982 and the West Virginia rule in 1985, three decades ago. OSM specifically found in 1982 that this standard was "consistent with the Court of Appeals ruling [in *In re: Surface Mining Regulation Litigation*, 627 F.2d 1346 (D.C. Cir. 1980)] and will help eliminate unnecessary duplication and confusion between EPA's and OSM's standards." 47 Fed. Reg. at 47217. In addition, EPA found in 1982 and 1985 that the federal and West Virginia standards were consistent with the CWA. Fola now argues that those standards are inconsistent with that same case and the CWA. Fola is therefore challenging OSM's 1982 and 1985 actions on the same grounds that both OSM and EPA rejected at that time. That challenge is over 30 years too late and has been brought in the wrong court.

## B. Federal and State SMCRA Performance Standards Are Consistent with the CWA

Fola argues that 38 C.S.R. § 2-14.5 conflicts with the CWA. Mem. at 41-42. That argument flies in the face of EPA's 1982 finding that that provision is consistent with the CWA. In the CWA, Congress required the achievement of any limitation necessary to meet water

---

[5] Alternatively, Section 1276(a)(1) allows a later challenge "if the petition is based solely on grounds arising after the sixtieth day." The sixty-day time limit applies to after-arising claims, so Fola's claim must still be filed within sixty days after the new grounds arose. *Coal River Energy, LLC v. Jewell*, 751 F.3d 659, 663 (D.C. Cir. 2014). Even if Fola's grounds did not arise in 1982 and 1985, then, at the latest, they arose each time Fola's mining permits were issued and reissued and became subject to that provision, most recently in 2011 for Mine #6 and 2014 for Mines #2 and #4A. Stipulation, Doc. 53, ¶s 11, 26, 44. Thus, even under that alternative scenario, Fola's claims would still be untimely under § 1276 because they have been raised more than sixty days after the challenged provision was applied to Fola in its permit renewals.

23

quality standards.  *See* 33 U.S.C. § 1311(b)(1)(C).  EPA's regulations under the CWA contain

the same requirement.  40 C.F.R. §§ 122.4(d), 122.44(d)(1).  So do OSM's SMCRA regulations.

30 C.F.R. § 816.42.  OSM has stated that "Congress intended that surface coal mining and

reclamation operations should not proceed unless all applicable water quality standards are

achieved and maintained."  44 Fed. Reg. 14902, 14927 (Mar. 13, 1979).  West Virginia's state

performance standard in 38 C.S.R. § 2-14.5 applies that same requirement, and it is embodied in

the permit condition at issue in this action.  The prevalence of this concept in SMCRA and the

CWA demonstrates its consistency and central importance in both statutes.

Furthermore, West Virginia has issued a certification under § 401 of the CWA for all

Nationwide Permits (NWPs) issued by the U.S. Army Corps of Engineers for stream-filling

activities under SMCRA permits.  One of the standard conditions in that certification provides

that "[t]he permittee will comply with water quality standards as contained in the West Virginia

Code of State Regulations, Requirements Governing Water Quality Standards, Title 46, Series

1."  USACE, Nationwide Permits for the State of West Virginia, Part G, West Virginia State 401

Certification Standard Conditions for Nationwide Permits, No. 13, p. 61 (2002), Pl. Ex. 5.[6]  All

of Fola's stream filling and mine-throughs in this case were authorized by NWP 21

authorizations, and are therefore subject to this condition.  Fola's NPDES permit shield pursuant

to § 402(k) does not apply to this condition, because the scope of the permit shield under that

section does not include certifications under § 401 of the CWA.  33 U.S.C. § 1342(k) (omitting

any reference to § 1341).  Thus, there is no inconsistency in this case between the CWA and

SMCRA.  Even if Fola's NPDES permits were modified to remove the condition requiring

compliance with water quality standards, Fola's § 401 certification still requires compliance with

---

[6] HB 2283 and SB 357 do not mention, and have no effect on, § 401 certifications.

those standards.[7]

C.    **Even if West Virginia's SMCRA Standard Were More Stringent than the CWA, SMCRA's Savings Clause Does Not Prohibit More Stringent State Performance Standards**

Even assuming that the West Virginia performance standard prohibiting violations of water quality standards were more stringent than the CWA, the CWA and SMCRA each expressly authorize more stringent state laws regulating water pollution.  Section 510 of the CWA provides that nothing in the CWA shall preclude a state from adopting or enforcing a standard or limitation on the discharge of pollutants, so long as that standard or limitation is not less stringent than federal law.  33 U.S.C. § 1370.  Similarly, the pre-emption provision of SMCRA, Section 505(a), provides that "no State law or regulation . . . shall be superseded by any provision of this chapter . . ., except insofar as such State law or regulation is inconsistent with the provisions of this chapter."  30 U.S.C. § 1255(a).  Section 505(b) authorizes states to enact and enforce "more stringent land use and environmental controls and regulations of surface coal mining and reclamation operations."  *Id.*, § 1255(b).

The 1977 Conference Report on SMCRA stated that it "retains the basic principle that the Federal law and regulations are minimum standards which may be exceeded by the States."  H. Rep. No. 493, 95th Cong., 1st Sess. 102 (1977), 1977 U.S.C.C.A.N. 728, 733.  Consistent with this principle, Section 505(b):

> clarifies that "more stringent" laws or regulations shall not be construed as "inconsistent."  Instead, the entire purpose of section 505(b) is to ensure that the federal standards act as a floor.  There would be no reason to allow the states to impose their own regulations if the regulations had to be the same as the federal Act and regulations.

*Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 237-38 (3rd Cir. 1995).  Similarly, in *FERC v.*

---

[7] "[T]he NPDES permitting system and the § 401 certification share a purpose; both must ensure compliance with state water quality standards."  *Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wash.2d 568, 603, 90 P.3d 659 (2004).

*Mississippi*, three Justices stated that Section 505(b) of SMCRA "explains that neither state laws that are more stringent than the federal standards nor state laws governing operations 'for which no provision is contained in this chapter' are 'inconsistent' with the congressional Act." 456 U.S. 742, 783 n. 11 (1983) (O'Connor, J., Burger, C.J, and Rehnquist, J. concurring in the judgment in part and dissenting in part). In *Penn. Coal Mining Ass'n v. Watt*, 562 F. Supp. 741, 746–47 (M.D. Pa. 1983), the court rejected the argument that SMCRA's savings clause compels uniformity between federal and state performance standards, because it:

> overlooks provisions in both the Clean Water Act and the Surface Mining Act that expressly allow states to set environmental and effluent standards that are more stringent than the federal criteria. Section 510 of the Clean Water Act, 33 U.S.C. § 1370, grants this authority to the states and courts have upheld it. *See U.S. Steel v. Train*, 556 F.2d 822, 838–39 (7th Cir. 1977), and *Homestake Mining Co. v. EPA*, 477 F. Supp. 1279, 1282, 1283–84 (S.D. 1979). Thus, the Secretary's approval of the more stringent state regulation is not inconsistent with the federal act, and indeed is in keeping with the general intent of Congress, as expressed in Section 505 of the act [30 U.S.C. 1255(a) and (b)], to permit states to develop laws and regulations providing for more stringent or different state controls.

*Id.* (brackets in original).

Section 505 of SMCRA and Section 510 of the CWA both contain explicit Congressional commands that more stringent state laws are not inconsistent with SMCRA. Congress therefore placed a higher value on environmental protection than on achieving uniformity with federal laws. If Fola's argument were accepted, and West Virginia's performance standard were overridden by the permit shield, it would have the opposite and impermissible effect of elevating federal uniformity over environmental protection.

Principles of statutory construction support this same conclusion. If two statutory provisions conflict, the more specific controls over the more general. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384-85 (1992). Applying this principle, the Supreme Court in *Morales* held that "[a] general 'remedies' saving clause cannot be allowed to supersede the

26

specific substantive pre-emption provision." *Id.* Thus, specific enabling language cannot be overridden by a general saving clause because the specific controls the general. By that logic, the specific SMCRA provision that authorizes states to enact "more stringent . . . environmental controls and regulations" cannot be overridden by SMCRA's general savings clause. "A savings clause is not intended to allow specific provisions of the statute that contains it to be nullified." *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 618 (7th Cir. 1998) (stating that "CERCLA's savings clause must not be used to gut provisions of CERCLA"); *see also Matter of Lifschultz Fast Freight Corp.,* 63 F.3d 621, 629 (7th Cir. 1995) ("when we are forced to choose between specific statutory provisions and a general savings clause, we err on the side of the specific provisions in the belief that they reflect congressional intent more clearly"). Consequently, SMCRA's savings clause cannot eliminate West Virginia's SMCRA rule requiring compliance with water quality standards.

> **D.** **If HB 2283 and SB 357 Had the Effect of Eliminating SMCRA's Federal and State Performance Standards Requiring Compliance With Water Quality Standards, then OSM's Approval, and EPA's Concurrence, Would Be Required Before That Change Could Take Effect**

If Fola's argument were correct that HB 2283 and SB 357 have the effect of eliminating SMCRA's federal and state performance standards requiring compliance with water quality standards, then those laws effect a change in West Virginia's state mining program under SMCRA, and that change cannot become effective unless and until it is reviewed and approved by OSM. OSM's regulations provide that "any alteration of an approved State program" must comply with the procedures set forth in 30 C.F.R. § 732.17. If there are "[c]hanges in the State law and regulations from those contained in the approved State program," then the State regulatory authority must notify OSM of that change. *Id.,* § 732.17(b)(3). Within thirty days after receiving this notification, OSM must determine whether a State program amendment is

necessary to implement the change.  *Id.,* § 732.17(c).  Such amendments may be required when "[c]onditions or events change the . . . enforcement of the State program."  *Id.*, § 732.17(d)(2).

Most relevant to the present case is § 731.17(g), which provides that:

> Whenever changes to laws or regulations that make up the approved State program are proposed by the State, the State shall immediately submit the proposed changes to the Director as an amendment. No such change to laws or regulations shall take effect for purposes of a State program until approved as an amendment.

Finally, state program amendments cannot be approved by OSM until it has obtained EPA's written concurrence "with respect to those aspects of a State program amendment(s) which relate to . . . water quality standards promulgated under the authority of the Clean Water Act."  *Id.,* § 732.17(h)(11)(ii).

Under Fola's interpretation, HB 2283 and SB 357 eliminate the ability of citizens to enforce the federal and state performance standards in SMCRA that require mining permittees to comply with water quality standards.  This is unquestionably a program amendment that significantly changes West Virginia's state program under SMCRA and requires OSM approval, and EPA's written concurrence, before it can become effective.  Since OSM has not issued such an approval, and EPA has not concurred, those performance standards remain in effect and are federally enforceable by citizens.

### E.     The Cases Cited by Fola Are Distinguishable or Wrongly Decided

In arguing that SMCRA's savings clause prohibits OSM from adopting rules more stringent than rules under the CWA, Fola relies on the D.C. Circuit's statement that "where the [SMCRA's] regulation of surface mining's hydrologic impact overlaps the EPA's, the Act expressly directs that the [CWA] and its regulatory framework are to control[.]"  Mem. at 40, quoting *In re Permanent Surface Min. Regulation Litigation*, 627 F.2d 1346, 1367 (D.C. Cir. 1980).  However, as we explained above, OSM adopted its federal rule requiring compliance

with water quality standards in response to that decision, and found that its rule was consistent with both that decision and the CWA.  The time for challenging that rule expired decades ago. In addition, the D.C. Circuit ruled that OSM may not alter the variances and exemptions adopted by EPA under the CWA by promulgating more stringent provisions for effluent discharges from surface coal mining operations.  No such variances or exemptions are at issue here.

Fola relies on *Sierra Club v. ICG Hazard, LLC*, 2015 WL 643382 (6th Cir. 2015).  In that case, ICG had a general permit under the CWA that shielded it from complying with the selenium water quality standard.  Plaintiffs sought in the alternative to enforce that standard by using the SMCRA requirement to comply with water quality standards.  The court of appeals held that the permit shield under § 402(k) was equivalent to the type of variance or exemption that the D.C. Circuit envisioned, and that allowing citizens to enforce the selenium water quality under SMCRA would create an inconsistency or conflict in regulatory practice, in contravention of § 702(a) of SMCRA.  *Id.* at *10.

Plaintiffs submit that *ICG* is distinguishable.  That court did not consider the situation in this case where Fola's § 401 certification also requires compliance with water quality standards. That certification makes the CWA and SMCRA consistent, not conflicting.  The permit shield in § 402(k) does not shield a NPDES permittee from complying with its § 401 certification, because § 401 is not even listed in § 402(k).  In contrast, that section does list sections 301 and 402, which were at issue in *ICG*.  Thus, even if the scope of the permit shield covered the situation in *ICG,* that is not the situation in this case.

Even if *ICG* were not distinguishable on these grounds, it is wrongly decided, for four reasons.  First, the Sixth Circuit did not consider Plaintiffs' argument in this case that Fola's collateral attack on the SMCRA rule and West Virginia performance standard are untimely and

brought in the wrong court. Second, the Sixth Circuit did not consider the cases cited in Part

III.C above which hold that a savings clause cannot override a specific statutory authorization

allowing more stringent state rules to protect the environment. Third, the scope of the permit

shield in § 402(k) is limited to the sections of the CWA listed in that section. Section 402(k)

does not mention anything about violations of other statutes, like SMCRA. Compliance with an

NPDES permit therefore does not displace any requirement to comply with SMCRA. The Sixth

Circuit effectively rewrote and expanded the scope of § 402(k) beyond its plain language.

Fourth, enforcing SMCRA's requirement to comply with state water quality standards is not

inconsistent with the CWA. As we have shown in Part III.A above, both EPA and OSM have

determined in rulemaking that that SMCRA requirement is consistent with the CWA, and that

determination is therefore entitled to *Chevron* deference as a permissible construction of the

statute.

Fola claims that *Sierra Club v. Powellton Coal Co., LLC*, 662 F. Supp. 2d 514, 532

(S.D.W. Va. 2009), supports its position. Mem. at 42. However, in that case, Judge Copenhaver

held that plaintiffs' complaint that Powellton had violated 38 C.S.R. § 2-14-5.b "stated a viable

claim under SMCRA." *Id*. at 531, 534. The Court rejected the broad reading of the SMCRA

savings clause proffered by Fola because it would have nullified the very performance standards

at issue:

> Further, were Powellton's proffered application of section 702(a) to be accepted, W. Va.
> Code R. § 38-2-14.5.b and its federal counterpart at 30 C.F.R. § 816.42 would be
> unenforceable by both private citizens as well as state and federal regulators. Indeed, any
> provisions of SMCRA, or the regulations promulgated thereunder, which overlap with
> the environmental enactments referred to in section 702(a) would be unenforceable.

*Id*. at 534 (footnote omitted). "Simply because the provision sought to be enforced incorporates,

in a consistent manner, standards imposed under the CWA does not mean that enforcement

thereof will alter, or 'supercede[], amend[], modify[], or repeal[],' the CWA." *Id.* (quoting 30 U.S.C. § 1292(a)).  In *Marfork*, 966 F. Supp. 2d at 684, this Court similarly recognized that Fola's argument does not create greater consistency, but instead allows specific numeric effluent limits to "trump" and "effectively nullif[y]" the water quality standard provision in SMCRA.

Similarly flawed is Fola's reliance on *dicta* in *Apogee*, where this Court expressly "refuse[d] to decide such an important issue in an indirect challenge" out of concerns of a "threat[]" that the CWA would be superceded.  555 F. Supp. 2d at 651.  Accordingly, this Court should follow the *Powellton* opinion and conclude that enforcement of water quality standards under SMCRA is consistent with the CWA.

**IV.    Even if the Court Determined, Contrary to Parts I-III Above, that Plaintiffs' CWA and SMCRA Claims Were Barred, Those Claims Are Co-extensive with Plaintiffs' Alternative Theory Alleging Fola's Noncompliance with Its § 401 Certification, and the Court Should Grant Plaintiffs Leave to Amend and Supplement Their Complaint to Add That Theory**

Until Fola filed its present motion for summary judgment based on the recent statutes enacted by the West Virginia Legislature, Plaintiffs reasonably believed, and this Court has found, that Plaintiffs' CWA claim provided a sufficient basis for holding Fola liable for violating narrative water quality standards.  After becoming aware of the potential impact of those new statutes, Plaintiffs have determined that there is an alternative legal theory, based on Fola's § 401 certification, for establishing liability based on the same facts and the same requirement to comply with water quality standards.  Plaintiffs will therefore seek to amend and supplement their complaint to add a new claim based on that theory.  But before they can file a motion to that effect under Rule 15, Plaintiffs must first file a notice of intent to sue and wait 60 days, as required by 33 U.S.C. § 1365(a)(1)(B).  The courts have held that citizen suits may be amended in this manner to add new claims after a 60-day notice is given during pending litigation. *Alliance for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 604 (9th Cir. 2014); *College*

*Park Holdings v. RaceTrac Petroleum*, 239 F. Supp.2d 1322, 1331-32 (N.D. Ga. 2002); *Fried v. Sungard Recovery Services, Inc.*, 900 F. Supp. 758, 766 (E.D. Pa. 1995); *Clorox Co. v. Chromium Corp.*, 158 F.R.D. 120, 126-27 (N.D. Ill. 1994); *City of Heath v. Ashland Oil, Inc.*, 834 F. Supp. 971, 983-84 (S.D. Ohio 1993); *Zands v. Nelson*, 779 F. Supp. 1254, 1260 (S.D. Cal. 1991).

This Court has held that "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *Watkins v. Wells Fargo Home Mortg.*, 631 F. Supp. 2d 776, 779 (S.D.W.Va. 2008), *quoting Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). None of those disqualifying factors are present here. Fola would not be prejudiced by such a motion because the new claim would be based on the same requirement to comply with water quality standards and the same facts that support the existing claims. No additional discovery would be required, except for documents relating to the § 401 certification. Plaintiffs' action has been litigated in good faith since Plaintiffs have already won two prior cases on the same legal theories they are pursuing in this case. The amendment would not be futile because the CWA citizen suit provision explicitly allows citizens to enforce conditions in § 401 certifications. 33 U.S.C. § 1365(f)(5); *North Carolina Shellfish Growers Ass'n v. Holly Ridge Assoc.*, 200 F. Supp. 2d 551, 558 (E.D.N.C. 2001).

Plaintiffs mailed their new notice letter with their § 401 certification claim on March 27, 2015. Pl. Ex. 6. If neither WVDEP nor EPA act to enforce that claim during the 60-day notice period, Plaintiffs will be able to move to amend and supplement their complaint with that claim on May 27, 2015. Plaintiffs therefore request that the Court refrain from dismissing this case and give Plaintiffs until May 29, 2015 to file a motion to amend and supplement their complaint.

**Conclusion**

For these reasons, Fola's motion for summary judgment should be denied.

Respectfully submitted,

MICHAEL BECHER
JOSEPH M. LOVETT
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
(304) 645-9006

JAMES M. HECKER
Public Justice
1825 K Street, N.W. Suite 200
Washington, DC 20006
(202) 797-8600

Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

     I, J. Michael Becher, hereby certify that on April 13, 2015, I served the foregoing Plaintiffs' Memorandum in Opposition to Fola's Motion for Summary Judgment through the Court's CM/ECF System.


                            Respectfully submitted,

                                     /s/ J. Michael Becher
                                   J. Michael Becher