## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

OHIO VALLEY ENVIRONMENTAL
COALITION, WEST VIRGINIA
HIGHLANDS CONSERVANCY and
SIERRA CLUB,

               Plaintiffs,

v.                                                                CIVIL ACTION NO.   2:13-21588
                                                                  (Consolidated with 2:13-16044)
FOLA COAL COMPANY, LLC,

               Defendant.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's Motion for Summary Judgment (ECF No. 66). For

the reasons explained below, Defendant's Motion is **DENIED**. Plaintiffs previously filed a Motion

for Summary Judgment on Jurisdictional Issues (ECF No. 64). The Court entered an Order on May

22, 2015, **GRANTING** Plaintiffs' motion, but reserving discussion of the bases for that decision

in a later opinion (ECF No. 85). Thus, in addition to discussing bases for denial of Defendant's

pending motion for summary judgment, this Memorandum Opinion and Order also sets forth the

bases for the decision to grant Plaintiffs' motion for partial summary judgment.

## I.      BACKGROUND

Plaintiffs Ohio Valley Environmental Coalition ("OVEC"), West Virginia Highlands

Conservancy, and Sierra Club filed this case pursuant to the citizen suit provisions of the Federal

Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1251 et seq., and the

Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1201 et seq. Compl., ECF

No. 1. Before proceeding to the parties' arguments, the Court will first discuss the relevant regulatory framework and then the factual background of this case.

### A. Regulatory Framework

The primary goal of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To further this goal, the Act prohibits the "discharge of any pollutant by any person" unless a statutory exception applies; the primary exception is the procurement of a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1311(a), 1342. Under the NPDES, the U.S. Environmental Protection Agency ("EPA") or an authorized state agency can issue a permit for the discharge of any pollutant, provided that the discharge complies with the conditions of the CWA. 33 U.S.C. § 1342. A state may receive approval to administer a state-run NPDES program under the authority of 33 U.S.C. § 1342(b). West Virginia received such approval, and its NPDES program is administered through the West Virginia Department of Environmental Protection ("WVDEP"). 47 Fed. Reg. 22363-01 (May 24, 1982). All West Virginia NPDES permits incorporate by reference West Virginia Code of State Rules § 47-30-5.1.f, which states that "discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by [West Virginia Code of State Rules § 47-2]."[1] This is an enforceable permit condition. *See, e.g., OVEC v. Elk Run Coal Co., Inc.*, No. 3:12-cv-0785, 2014 WL 29562, at *3, 6 (S.D. W. Va. Jan. 3, 2014).

Coal mines are also subject to regulation under the SMCRA, which prohibits any person from engaging in or carrying out surface coal mining operations without first obtaining a permit from the Office of Surface Mining Reclamation and Enforcement ("OSMRE") or an authorized

---

[1] As thoroughly discussed below, at the time of filing, the mining operations at issue here were each regulated under WV/NPDES reissued in 2008. At that time, W.Va. Code R. § 47-30-5.1.f read as quoted here.

state agency. 30 U.S.C. §§ 1211, 1256, 1257. A state may receive approval to administer a state-run surface mining permit program under the authority of 30 U.S.C. § 1253. In 1981, West Virginia received conditional approval of its state-run program, which is administered through the WVDEP pursuant to the West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA"). W. Va. Code §§ 22-3-1 to -33; 46 Fed. Reg. 5915-01 (Jan. 21, 1981). Regulations passed pursuant to the WVSCMRA require permittees to comply with the terms and conditions of their permits and all applicable performance standards. W. Va. Code R. § 38-2-3.33.c. One of these performance standards requires that mining discharges "shall not violate effluent limitations or cause a violation of applicable water quality standards." *Id.* § 38-2-14.5.b. Another performance standard mandates that "[a]dequate facilities shall be installed, operated and maintained using the best technology currently available . . . to treat any water discharged from the permit area so that it complies with the requirements of subdivision 14.5.b of this subsection." *Id.* § 38-2-14.5.c.

### B. Factual Background

This controversy concerns discharges from three surface mines along the southern portion of the Leatherwood Creek watershed: (1) Fola Surface Mine No. 2 in Clay and Nicholas Counties, West Virginia; (2) Fola Surface Mine No. 4A in Clay County, West Virginia; and (3) Fola Surface Mine No. 6 in Nicholas County, West Virginia. Stipulation of the Parties ¶6, ECF No. 53.

Defendant's mining activities at Surface Mine No. 2 are regulated under WV/NDPES Permit WV1013840 and West Virginia Surface Mining Permit S201293, both originally issued in 1994. Stipulation of the Parties ¶¶6–7, ECF No. 53. WVDEP reissued WV/NPDES Permit No. WV1013840 in 2001, 2004, 2008, and 2014. At the time this complaint was filed, the 2008

reissuance was in effect. Outfall 001 of Surface Mine No. 2 discharges into Road Fork and Leatherwood Creek. *Id.*

Defendant's mining activities at Surface Mine No. 4A are regulated under WV/NPDES Permit WV1013815 and West Virginia Surface Mining Permit S200502. *Id.* at ¶¶21, 23. WV/NPDES Permit WV1013815 was originally issued in 1993, and was reissued in 1999, 2006, 2008, and 2014. At the time this complaint was filed, the 2008 reissuance was in effect. Outfalls 22, 23, and 027 of Surface Mine No. 4A discharge into Right Fork of Leatherwood Creek. *Id.*

Finally, Defendant's mining activities at Surface Mine No. 6 are regulated under WV/NPDES Permit WV1018001 and West Virginia Surface Mining Permit S2011999, both originally issued in 2000. WVDEP reissued WV/NPDES Permit WV1018001 in 2008. At the time this complaint was filed, the 2008 reissuance was in effect. Outlets 013, 015, and 017 of Surface Mine No. 6 discharge into Cogar Hollow, a small tributary of Leatherwood Creek.

In recent years, water quality measurements from the above listed discharges have routinely shown discharges of high conductivity. Stipulation at ¶14, ECF No. 53 (showing discharges from Outlet 001 at Mine No. 2 with conductivity measurements consistently around 3000 µS/cm); Stipulation at ¶32 (showing discharges from Outlets 22, 23, 27 at Mine No. 4A consistently ranging from approximately 1500 µS/cm to above 3000 µS/cm); Stipulation at ¶47 (showing discharges from Outlets 013, 015, 017 with conductivity measurements consistently ranging from approximately 2500 µS/cm to 4000 µS/cm). Water quality measurements have also revealed elevated conductivity in Leatherwood Creek and its tributaries. *Id.* at ¶13 (showing conductivity levels ranging from 3000 µS/cm to 4000 µS/cm in Road Fork); *Id.* at ¶33 (showing conductivity levels consistently above 1000 µS/cm below Mine No. 4A); *Id.* at ¶46 (showing conductivity levels ranging from 3000 µS/cm to 5000 µS/cm in Cogar hollow).

-4-

Plaintiffs moved for partial summary judgment in their favor on jurisdictional issues. Pls.' Mot. Part. Summ. J., ECF No. 64, *see also* Pls.' Mem. Supp. Mot. Part. Summ. J., ECF No. 65. Specifically, Plaintiffs assert that they have standing as a matter of law through their members James Tawney and Cindy Rank. *Id.* Defendant filed a Response in opposition, ECF No. 70, and Plaintiffs filed a Reply, ECF No. 77. Additionally, Defendant has moved for summary judgment on the grounds that: (1) conductivity is not a pollutant subject to regulation by the CWA or Fola's NPDES Permits; (2) Fola's NPDES Permits do not limit discharges of pollutants that are not specifically identified in the permits; (3) West Virginia law requires evidence of impacts to fish to prove a violation of narrative standards; (4) a permit condition incorporating all water quality standards as express effluent limitations is unenforceable; and (5) SMCRA prohibits use of state surface mining rules to circumvent the CWA permit shield. Def.'s Mot. Summ. J., ECF No. 66, Def's Mem. Supp. Mot. Summ. J. ECF No. 75. Plaintiffs filed a Response in opposition, ECF No. 71, and Defendant filed a Reply, ECF No. 78.

Both motions are ripe for resolution. In Section II, the Court discusses the legal standard applicable to motions for summary judgment. In Section III, the Court examines the parties' arguments concerning standing. In Section IV, the Court examines the parties' arguments concerning liability.

## II.   LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the

light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his position. *Anderson*, 477 U.S. at 252.

"'[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 822 (D. Md. 1998) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "Thus, if the movant bears the burden of proof on an issue, . . . he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Having discussed the standard for review of motions for summary judgment, the Court now turns to the parties' arguments concerning standing.

### III. JURISDICTIONAL ISSUES

#### A. Constitutional Standing Requirements

In order to bring any action in federal court, a plaintiff must have standing—that is, a plaintiff must have a sufficient personal stake in the outcome of the matter being litigated to make

it justiciable under Article III of the Constitution. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* ("*Gaston Copper I*"), 204 F.3d 149, 153 (4th Cir. 2000); *see also* U.S. Const. art. III (restricting federal courts to adjudicating "cases" and "controversies"). In order to satisfy the minimum constitutional requirements for standing, an individual plaintiff must demonstrate:

> (1) [he] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). In environmental cases, "a plaintiff need only show that he used the affected area, and that he is an individual 'for whom the aesthetic and recreational values of the area [are] lessened' by the defendant's activity." *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., MD*, 268 F.3d 255, 263 (4th Cir. 2001) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972)). Furthermore, "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 181.

As this Court explained in *OVEC v. Maple Coal Company*, a court is not required to determine the merits of the environmental violations alleged when deciding if standing exists. 808 F. Supp. 2d 868, 882 (S.D. W. Va. 2011) (citing *Laidlaw*, 528 U.S. at 181). "What [standing] does require is a demonstration that if the allegations of Clean Water Act violations are true, the impacts of the alleged violations are felt in an area with which the plaintiffs have 'a direct nexus.'" *Id.* (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* ("*Gaston Copper II*"), 629 F.3d 387, 395 (4th Cir. 2011)). Plaintiffs "may rely on circumstantial evidence such as proximity to polluting sources, predictions of discharge influence, and past pollution to prove both injury in fact and traceability." *Gaston Copper I*, 204 F.3d at 163. To require more would contravene the

-7-

otherwise "straightforward Clean Water Act issue of whether [the defendant] has violated its permit limitations," thereby "throw[ing] federal legislative efforts to control water pollution into a time warp by judicially reinstating the previous statutory regime in the form of escalated standing requirements." *Id.* at 163-64.

When the plaintiff in question is an organization, that organization "has standing to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

### B. Application of Constitutional Standing Requirements

Plaintiffs claim to satisfy standing requirements through their members James Tawney and Cindy Rank. Both Mr. Tawney and Ms. Rank are members of the West Virginia Highlands Conservancy, the Ohio Valley Environmental Coalition, and the Sierra Club. Pls.' Ex. E at ¶¶2-4, ECF No. 64-5; Pls' Ex. F at ¶¶2-8, ECF No. 64-6. As explained below, the Court finds that through the declarations of Mr. Tawney and Ms. Rank, Plaintiffs readily satisfy standing requirements.

#### 1. *Injury in fact*

James Tawney grew up in Clay County, West Virginia. Pls.' Ex. E at ¶1, ECF No. 64-5. Throughout his childhood and to this day he has visited and fished in many of the rivers and streams found throughout the county, including the Elk River. *Id.* at ¶¶7-9. Though Mr. Tawney previously fished in Leatherwood Creek as well, he has since stopped fishing the creek out of concern about pollution from Defendant's surface mine operations. *Id.* Mr. Tawney expressed particular concern over the high conductivity discharges from these mines. *Id.* at ¶¶11-12. In addition to recreational visits, Mr. Tawney also visits Leatherwood Creek when visiting his

stepmother's nearby grave site. *Id.* at ¶14. As explained by Mr. Tawney, "[i]t is insulting that the peaceful setting chosen for my stepmother's eternal rest is disturbed by the destruction of the environment in the area—including the pollution of the nearby streams." *Id.*

Like Mr. Tawney, Ms. Rank has also been a long-standing visitor to the Elk River, regularly traveling along the river since the 1970s. Pls.' Ex. F at ¶11, ECF No. 64-6. Ms. Rank has been visiting Leatherwood Creek since 2003 or 2004, but her enjoyment of the creek has been limited by her knowledge of pollution from Defendant's surface mine operations. *Id.* at ¶¶13-19.

Both Mr. Tawney and Ms. Rank are individuals who have used the area effected by Defendant's discharges and both have suffered the loss of aesthetic and recreational value. Contrary to Defendant's arguments, their statements of injury are sufficiently concrete and particularized to establish injury-in-fact. Knowledge on the part of both individuals that the effected streams suffer from not only the alleged ionic pollution at issue in this case, but also other impairments which they presume are traceable to Defendant's operations does not lessen the injury suffered. In summary, Ms. Rank and Mr. Tawney have demonstrated a concrete and actual harm to their aesthetic and recreational interests as a result of ionic pollution in Leatherwood Creek.

### 2. Traceability

Plaintiffs' injuries are fairly traceable to Defendant's discharges of ionic pollution in alleged violation of its WV/NPDES Permit because the declarants claim that their injuries resulted from elevated pollution in the same waterway into which Defendant discharges pollutants. *OVEC v. Marfork Coal Co., Inc.*, No. 5:12-cv-1464, 2013 WL 4509601, at *5 (S.D. W. Va. Aug. 23, 2013). Defendant does not argue that the areas used by Plaintiffs' declarants in Leatherwood Creek are not affected by its mining and discharges. Therefore, traceability has been shown.

### 3. Redressability

The Court finds that Plaintiffs also satisfy the final standing element, redressability. Plaintiffs seek injunctive relief requiring Defendant to reduce its discharge of ionic pollution to comply with the terms of its permit. This relief would provide redress for declarants' injuries by reducing the amount of ionic pollution in Leatherwood Creek. It is not necessary that such relief completely relieve every injury suffered by Mr. Tawney and Ms. Rank; relieving the impacted waters from the ionic pollution, but not *all* pollution, is adequate redress for standing purposes.

### 4.  Organizational Standing

The Court finds that Plaintiffs have constitutional standing. Declarants are members of all of the plaintiff organizations. They have demonstrated: (1) injuries in fact which are (2) fairly traceable to Defendant's alleged violations and which (3) are able to be redressed by a favorable decision in this case. These two declarants support Plaintiffs' organizational standing because, A) as individual members, they would have standing to sue in their own right, B) the interests Plaintiffs seek to protect are germane to Plaintiffs' overall purpose to conserve and preserve the environment and natural resources, and C) neither the claims asserted nor the relief requested requires the participation of individual members.

### C.  Statutory Requirements for Citizen Suit

Under the CWA and SMCRA, no citizen suit may be commenced prior to the provision of sixty days' notice to the alleged violator, the Administrator of the EPA (for CWA citizen suits) or the Secretary of the Department of the Interior (for SMCRA citizen suits), and the State in which the alleged violation occurs. 30 U.S.C. § 1270(b)(1)(A); 33 U.S.C. § 1365(b)(1)(A). The notice must provide:

> sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a) (notice requirement for CWA citizen suit); *see also* 30 C.F.R. § 700.13(e) (notice requirement for SMCRA citizen suit). Providing such notice "is a mandatory condition precedent to filing suit under [the CWA]." *Gaston Copper II,* 629 F.3d at 399 (citing *Hallstrom v. Tillamook Cnty.,* 493 U.S. 20, 31, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989)). "Without adequate notice, the Court does not have subject matter jurisdiction to hear the case." *Assateague Coastkeeper v. Alan & Kristin Hudson Farm,* 727 F.Supp.2d 433, 437 (D.Md.2010) (citation omitted). The purpose of the notice is to "allow a potential defendant to identify its own violations and bring itself into compliance voluntarily," *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York,* 273 F.3d 481, 488 (2d Cir.2001) (citations omitted), and to "[allow] Government agencies the opportunity to take responsibility to enforce the environmental regulations," *Assateague Coastkeeper,* 727 F.Supp.2d at 437 (citing *Hallstrom,* 493 U.S. at 29). Accordingly,

> [A]s long as a notice letter is reasonably specific as to the nature and time of the alleged violations, the plaintiff has fulfilled the notice requirement. The letter does not need to describe every detail of every violation; it need only provide enough information that the defendant can identify and correct the problem.

*San Francisco Baykeeper, Inc. v. Tosco Corp.,* 309 F.3d 1153, 1155 (9th Cir.2002)."The sufficiency of the plaintiffs' notice letter must be assessed based on the facts that existed" at the time notice was provided. *Gaston Copper II,* 629 F.3d at 401.

The parties do not dispute that Plaintiffs have satisfied their statutory obligation to provide sixty days' notice. Plaintiffs sent a letters postmarked February 8, 2013, and April 3, 2013 (Fola Mine No. 2 and No. 6) and on May 23, 2013 (Fola Mine No. 4) in order to provide notice. Pls.' Ex. G, Notice Letters, ECF No. 64-7; Pls.' Ex. H, Return Receipts, ECF No. 64-8; Pls.' Ex. I, Attorney Declarations, ECF No. 64-9. Plaintiffs filed the pending Complaint on August 8, 2013, over sixty

-11-

days later. Compl., ECF No. 1. Accordingly, the Court further finds that Plaintiffs have satisfied the statutory citizen suit notice requirements.

## IV.   POTENTIAL CLEAN WATER ACT LIABILITY

As mentioned above, Defendant moves for summary judgment on the question of liability, arguing that Plaintiffs' claim should be denied as a matter of law because: (1) conductivity is not a pollutant subject to regulation by the CWA or Fola's NPDES Permits; (2) Fola's NPDES Permits do not limit discharges of pollutants that are not specifically identified in the permits; (3) West Virginia law requires evidence of impacts to fish to prove a violation of narrative standards; (4) a permit condition incorporating all water quality standards as express effluent limitations is unenforceable; and (5) SMCRA prohibits use of state surface mining rules to circumvent the CWA permit shield. Def.'s Mot. Summ. J., ECF No. 66, Def's Mem. Supp. Mot. Summ. J. ECF No. 75. Plaintiffs respond—and the Court agrees—that the majority of Defendant's arguments have been previously considered and rejected by this Court.[2] Thus, while each of Defendant's arguments under the CWA will be considered, discussion will focus on Defendant's novel and previously unresolved arguments; specifically, those arguments relating to the import of House Bill 2283 ("HB2283") and Senate Bill 357 ("SB 357").[3]

### A.  Effect of HB 2283 and SB 357 on Plaintiffs' CWA claims

As previously explained by this Court, through incorporating by reference W.Va. Code R. § 47-30-5.1.f into WV/NPDES permits, WVDEP imposed an enforceable permit condition on

---

[2] *See Ohio Valley Envtl. Coal., Inc., et al. v. Marfork Coal Co., Inc., et al.*, 966 F.Supp.2d 667 (S.D. W.Va. 2013); *Ohio Valley Envtl. Coal., Inc., et al. v. Fola Coal Company, LLC,* No. 2:12-cv-3750, 2013 WL 6709957 (S.D.W.Va. Dec. 19, 2013); *Ohio Valley Envtl. Coal., Inc., et al. v. Alex Energy, Inc., et al.,* 12 F.Supp.3d 844 (S.D.W.Va. 2014); *Ohio Valley Envtl. Coal., Inc. v. CONSOL of Kentucky, Inc.,* 2:13-cv-5005, 2014 WL 1761938 (S.D.W.Va. Apr. 30, 2014); *Ohio Valley Envtl. Coal., Inc., et al. v. Elk Run Coal Co., Inc., et al.,* 3:12-cv-0785, 2014 WL 29562 (S.D.W.Va. Jan. 3, 2014)*; Ohio Valley Envtl. Coal., Inc., et al. v. Elk Run Coal Co., Inc., et al,* No. 3:12-cv-0785, 2014 WL 2526569 (S.D.W.Va. June 4, 2014); *Ohio Valley Envtl. Coal., Inc., et al. v. Fola Coal Co., LLC,* No. 2:13-cv-5006, 2015 WL 362643 (S.D.W.Va. Jan. 27, 2015).

[3] Because Plaintiffs' CWA claims survive Defendant's motion for summary judgment, the Court declines to address Defendant's arguments under SMCRA.

permittees. *Marfork*, 966 F. Supp. 2d at 985; *OVEC v. Fola Coal Company, LLC,* No. 2:12-cv-3750, 2013 WL 6709957, at *11 (S.D.W.Va. Dec. 19, 2013); *OVEC v. Consol of Kentucky, Inc.*, 2014 WL 1761938, at *3 (S.D. W.Va. 2014); *OVEC v. Alex Energy, Inc.*, 34 F. Supp. 3d 632, 637 (S.D. W.Va. 2014); *OVEC v. Elk Run Coal Company, Inc.*, 24 F. Supp. 3d 532, 537 (S.D. W.Va. 2014); *OVEC v. Fola Coal Co., LLC,* 2015 WL 362643, at *1 (S.D. W.Va. 2015). The permits at issue in this case were reissued in 2008 and included the version of W.Va. Code R. § 47-30-5.1.f examined in earlier cases, but that version has since been revised. Recent actions by the West Virginia Legislature amended W.Va. Code R. § 47-30-5.1.f and sections of the West Virginia Water Pollution Control Act ("WPCA"). Based on these changes, Defendant asserts that its permits no longer require compliance with state water quality standards independent of specific numeric effluent limits listed in Section A of its permits.

The first of the two relevant legislative changes came via HB 2283. Through HB 2283 WVDEP proposed a change directly to W. Va. Code R. § 47-30-5.1.f, striking the first sentence as follows:

> ~~The discharge or discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by 47 C.S.R. 2. Further, a~~ Any activities covered under a WV/NPDES permit shall not lead to pollution of the groundwater of the State as a result of the disposal or discharge of such wastes covered herein. However, as provided by subdivision 3.r.a. of this rule, except for any toxic effluent standards and prohibitions imposed under CWA Section 307 for toxic pollutants injurious to human health, compliance with a permit during its term constitutes compliance for purposes of enforcement with CWA Section 301, 302, 306, 307, 318, 403, and 405 and Article 11.

Def.'s Ex. 21, ECF No. 66-21. As explained by WVDEP, this change was "proposed as a result of the passage of Senate Bill 615 by the West Virginia Legislature on March 20, 2012," and was intended by WVDEP to be "consistent with Section 402(k) of the federal Clean Water Act." Def.'s

Ex. 22, ECF No. 66-22. HB 2283 was approved by the Legislature as originally proposed by

WVDEP, and took effect upon passage on March 12, 2015.

In addition to HB 2283, the West Virginia Legislature enacted a second relevant change

through SB 357, which amends § 22-11-6 of the State WPCA to explain that:

> Notwithstanding any provision of this code or rule or permit condition to the
> contrary, water quality standards themselves shall not be considered "effluent
> standards or limitations" for the purposes of both this article and sections 309 and
> 505 of the federal Water Pollution Control Act and shall not be independently or
> directly enforced or implemented except through the development of terms and
> conditions of a permit issued pursuant to this article.

S.B. 357, 82nd Leg., 1st Reg. Sess. (W.Va. 2015). SB 357 further amends § 22-11-8 of the State

WPCA to add that:

> While permits shall contain conditions that are designed to meet all applicable state
> and federal water quality standards and effluent limitations, water quality standards
> themselves shall not be incorporated wholesale either expressly or by reference as
> effluent standards or limitations in a permit issued pursuant to this article.

S.B. 357, 82nd Leg., 1st Reg. Sess. (W.Va. 2015). As described by the West Virginia Senate, SB

357 was intended as an act "prohibiting wholesale incorporation of water quality standards into

permits; [and] modifying the scope of the permit shield as it relates to compliance with water

quality standards." Enrolled Committee Substitute for SB 357 (passed March 3, 2015). SB 357

was signed by the Governor on March 12, 2015, and will be effective under state law on June 1,

2015.

Notwithstanding prior federal court rulings concerning the enforceability of West

Virginia's narrative water quality standards as incorporated into WV/NPDES permits under West

Virginia's federally approved NPDES program, Defendant argues that HB 2283 and SB 357

effectively remove any prior ambiguity regarding the intended import of water quality standards.

In light of these purported clarifications, Defendant concludes that it is not liable for alleged

violations of water quality standards under its 2008 WV/NPDES permits. However, as explained below, because the required processes for program revision and permit modification have not been undertaken, much less completed, HB 2283 and SB 357 presently have no effect under federal law and do not alter Defendant's existing permits.

      **1.    Unless and until approved by EPA, HB 2283 and SB 357 have no effect under federal law and no effect on Plaintiffs' CWA claims**

EPA first approved West Virginia's NPDES permit program under section 402 of the CWA in 1982. 33 U.S.C. § 1342; 47 Fed. Reg. 22363 (May 24, 1982). Upon approval, the EPA ceded primary permitting authority to the state; however, West Virginia must administer its approved NPDES program in compliance with federal standards. 33 U.S.C. § 1342(c)(2) ("Any State permit program under this section shall at all times be in accordance with this section and guidelines promulgated" under the CWA). "After obtaining initial approval of a state NPDES program, a state with delegated authority can modify its program with EPA approval." *Wisconsin Resources Protection Council v. Flambeau Min. Co.*, 727 F.3d 700, 703 (7th Cir. 2013).

Revisions to state programs are governed by 40 C.F.R. § 123.62. "As a matter of plain English usage, the term revision encompasses *any modification* in the requirements of a plan . . ." *Concerned Citizens of Bridesburg v. U.S. E.P.A.*, 836 F.2d 777, 785 (3rd Cir. 1987) (emphasis added) (interpreting a similar requirement under the Clean Air Act). As explained in the federal regulations, "[p]rogram revision may be necessary when the controlling Federal or State statutory or regulatory authority is modified or supplemented." *Id.* In order to initiate a program revision, the State authority is required to submit a modified program description or other document required by the EPA. 40 C.F.R. § 123.62(b)(1). If the EPA determines that "the proposed program revision is substantial, EPA shall issue public notice and provide an opportunity to comment for a period of at least 30 days." 40 C.F.R. § 123.62(b)(2). Whether deemed substantial or not, the EPA

-15-

has authority to approve or disapprove the proposed revision, and revisions are only effective upon approval by the EPA. 40 C.F.R. § 123.62(b)(3)-(4).

As previously observed by this Court, action by the West Virginia Legislature eliminating the otherwise required compliance with water quality standards would constitute a revision to West Virginia's approved NPDES program, and such a revision would not be effective unless and until approved by the EPA. *Marfork*, 966 F.Supp.2d at 681, n.8. As recognized by the West Virginia Legislature, SB 357 has the effect of modifying the scope of the permit shield relative to water quality standards. This is a significant change, to say the least. Citizens have successfully proven permit violations based on violations of water quality standards, and as interpreted by Defendant, HB 2283 and SB 357 would strip away that previously effective enforcement avenue.[4] State action that may eliminate an enforceable permit condition, program-wide, potentially strikes against the very purpose of the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

Before the State makes such a significant revision to its NPDES program, federal law requires EPA consideration and approval. Here, there is no evidence that either the EPA or the State has initiated the program revision process since the passage of HB 2283 and SB 357. More to the point, there is no evidence that the EPA has approved NPDES program changes affected through HB 2283 and SB 357, and such changes therefore have no effect under federal law.

### 2. Even assuming eventual federal approval, HB 2283 and SB 357 cannot modify existing permits unless and until WVDEP properly modifies individual permits.

In the alternative, even if the Court were to give the NPDES program changes immediate effect in defiance of federal law, HB 2283 and SB 357 cannot modify Fola's permits unless and until Fola complies with permit modification procedures.

---

[4] The Court reserves judgment on whether the amendments passed via HB 2283 and SB 357 will ultimately have the effect urged by Defendant.

Federal and state regulations set out the proper procedure for issuing permit modifications. Permit modifications may be "major" or "minor," with only the former type of modification requiring preparation of a draft permit and public notice. 40 C.F.R. §§ 122.62, 122.63, W.Va. Code R. § 47-30-8.2.c. The circumstances at issue in this case are clearly outside the possible minor modifications listed under both federal and state regulations, suggesting to the Court that these circumstances must constitute a major permit modification. *See* 40 C.F.R. § 122.63; W.Va. Code R. § 47-30-8.2.c.1. Indeed, the the approved regulations expressly categorize modifications based on new or amended rules and standards as major modifications. W.Va. Code R. § 47-30-8.2.c.2.; *see also Sierra Club v. Powellton Coal Co., LLC*, 2010 WL 454929, at *16 (S.D. W.Va. 2010). In relevant part, West Virginia's approved regulations provide as follows:

> Major Modifications. The following are causes for major modification, . . . and require the preparation of a draft permit under subsection 10.1. of this rule and the public notice procedures of subsection 10.2. of this rule . . .
> . . .
> (C) New Rules or Judicial Decision. The standards or rules on which the permit was based have been changed by promulgation of amended standards or rules or by judicial decision after the permit was issued. Permits may be modified during their terms for this cause only as follows:
> > (1) For promulgation of amended standards or rules, when:
> > > (a) The permit condition to be modified was based on a promulgated effluent limitation guideline or water quality standard;
> > > (b) The EPA or State has revised, withdrawn, or modified that portion of the effluent limitation guideline or water quality standard on which the permit condition was based; and
> > > (c) If a modification request is made by the permittee, such request is within ninety (90) days of Federal Register or State Register notice of the action on which the request is based, unless the effluent limitations guidelines allow for a different time period.

W.Va. Code R. § 47-30-8.2.c.2. Unlike their minor counterparts, major modifications require that (1) the WVDEP "shall prepare a draft permit," (2) "public notice shall be given that a draft permit has been prepared," and (3) WVDEP "shall allow at least thirty (30) days for public comment." W.Va. Code R. §§ 47-30-8.2.b. and 47-30-10.2.a.

-17-

Absent compliance with proper procedure, modifications cannot change the terms of the underlying permit. *OVEC v. Apogee Coal Co., LLC*, 555 F.Supp.2d 640, 645 (S.D. W.Va. 2008). At least three circuit courts of appeal, including the Fourth, have held that a modification to a permit will not prevent a citizen suit action on the terms of the underlying permit if that modification does not comport with proper procedure. *Id.* at 754–55; *see also, Proffitt v. Rohm & Haas,* 850 F.2d 1007 (3d Cir.1988) (holding that a stipulation did not change the terms of a permit because of procedural flaws which eliminated opportunity for public participation); *Citizens for a Better Env't—California v. Union Oil Co. of California,* 83 F.3d 1111 (9th Cir.1996) (holding that a settlement agreement containing interim permit limits did not change the terms of a previously issued permit—in part due to non-compliance with public notice procedures); *U.S. v. Smithfield Foods,* 191 F.3d 516 (4th Cir.1999) (holding that orders could not modify the permit because Smithfield "did not follow the procedures required for the modification of a permit, and none of the Board's Special Orders and letters were issued in accordance with the permit modification procedures.").

Here, following the passage of HB 2283 and SB 357, Defendant's permits have not been modified through the prescribed process, nor has such modification been initiated. Without following the prescribed major permit modification requirements, Plaintiffs may proceed based on the terms as originally stated in the 2008 reissued permits. Stated differently, absent compliance with required major permit modification requirements, HB 2283 and SB 357 have no effect on Defendant's 2008 NPDES permits and West Virginia water quality standards remain an enforceable condition of those permits.

Against this relatively straightforward analysis requiring compliance with permit modification procedures, Defendant argues (1) that no permit modification has occurred, (2) that

-18-

the West Virginia legislature intended HB 2283 and SB 357 to apply to existing permits without modification, and (3) that Defendant's due process rights would be violated by not giving HB 2283 and SB 357 immediate effect.[5]

Defendant's first argument—that revisions to W. Va. Code R. § 47-30-5.1.f. do not alter the text of the permit and thereby cannot amount to a permit modification—epitomizes the absurdity of neglecting substance in favor of form. According to Defendant, no "modification" to the permits occurs because the text of the permits will continue to read as follows, regardless of the actual content of W.Va. Code R. § 47-30-5.1.f:

C.    TERMS AND CONDITIONS INCORPORATED BY REFERENCE TO THE WV NPDES REGULATIONS FOR COAL MININ AND FACILITIES, TITLE 47, SERIES 30.

5.1    Duty to Comply, Penalties

Def.'s Ex. 1 at 16, ECF No. 66-1; Def.'s Ex. 2 at 13, ECF No. 66-2; Def.'s Ex. 3 at 20, ECF No. 66-3. Though the permit text may be unaltered, Defendant maintains that, as amended, W Va. Code R. § 47-30-5.1.f has the effect of directly contradicting this Court's previous and numerous holdings that narrative water quality standards were incorporated into NPDES as enforceable permit conditions. Thus, if Defendant is correct, the amendment removes a previously enforceable permit condition. That the text of the permit itself would read the same cannot overshadow the fact that those same words may have a dramatically different import.

Defendant also suggests that modification is not required because the West Virginia legislature did not intend for modification to be necessary. Whatever the intention of the legislature, this Court cannot ignore the applicable federal and state laws outlined above, requiring

---

[5] This final due process argument amounts to an assertion that interpreting the 2008 reissued permits to include narrative water quality standards as an enforceable permit condition violates Defendant's due process rights. That argument has been discussed at length by the Court in previous opinions, a discussion that will be briefly revisited in an independent subsection below.

compliance with permit modification procedures. These laws protect due process interests of not only the general public, but also regulated entities. Imagine an alternate scenario wherein the West Virginia legislature attempted to immediately impose an industry-wide numeric conductivity effluent limit on future *and existing* permits. As a matter of course, this Court would protect the right of a regulated entity with a previously issued permit to the benefit of required process for modification of existing permits. Here, we find ourselves on the other side of that coin, protecting the due process interests of the general public related to permit modifications.

Defendant suggests that public notice and comment on a permit modification would be meaningless because Plaintiffs were afforded an opportunity to comment on HB 2283 and SB 357 during the legislative process. The Court cannot agree with such a disappointingly narrow view of the requirement and import of public notice and comment for at least two reasons. First, the regulations specifically contemplate individual major permit modifications that result from legislative and administrative rule changes and they do so without creating an accompanying exception to notice and comment requirements. That suggests to the Court though the rule change that is a catalyst to an individual major permit modification may have itself afforded notice and comment opportunities, that has no effect on the clear requirements for notice and comment on a proposed major permit modification. Second, just as WVDEP makes case-by-case determinations of the permit conditions necessary to ensure compliance with water quality standards, so too must interested parties be afforded an opportunity to offer case-specific comments. Here, it is readily foreseeable that by possibly removing the assurance that water quality standards be met regardless of the specific numeric effluent limitations provided in the permit, interested parties—and even the WVDEP itself—may urge the addition of any number of specific numeric effluent limitations to individual permits (e.g., numeric limits on ionic pollution as measured by conductivity).

Of course, an opportunity to receive notice and provide comment is not a guarantee of influence, but it is nonetheless a vital guarantee of participation under both state and federal law, and one this Court is unwilling to shirk. Unless and until Defendant complies with major modification requirements, its 2008 permits remain unchanged by HB 2283 and SB 357. Having concluded that these recent legislative actions do not yet have any effect on Defendant's permits or Plaintiffs' CWA claims, the Court is left only with arguments already raised and settled in previous cases.

**B. Discharges of ionic pollutants, as measured by conductivity, are subject to regulation under the CWA and SMCRA.**

Defendant argues that conductivity is not a pollutant that causes violations of water quality standards, and it is therefore not subject to regulation by the CWA or Fola's NPDES Permits. ECF No. 75 at 16. This argument was squarely addressed by the Court in *OVEC v. Fola Coal Co., LLC*, 2014 WL 4925492, at *3-*12 (S.D. W.Va. 2014), where the Court observed that "while conductivity may not generally be considered a pollutant, in this unique and well-studied region [of Appalachia], it is a reasonable proxy for specific ionic pollutants known to cause violations of West Virginia's narrative water quality standards." *Id.* at *12. Though conductivity may not be an adequate indicator of harmful ionic pollution in every circumstance, a growing body of uncontroverted scientific publications—particularly including expert findings by the EPA—strongly suggests that waters in specific Appalachian Regions are "dominated by salts of $Ca^{2+}$, $Mg^{2+}$, $SO_4^{2-}$ and $HCO_3^-$ at circum-neutral to mildly alkaline pH." *Id.* at *4 (citing EPA's Benchmark). Thus, Plaintiffs are required to rely on something more than bald recitations of conductivity measurements; Plaintiffs must also supply some basis for concluding that the ionic mixture responsible for generating those conductivity measurements includes harmful ionic pollutants.

The instant dispute concerns mines located in the same ecoregions considered in *Fola I* and discharges of alkaline mine drainage from those operations. Stipulation, ECF No. 53. The parties have supplied a stipulation reporting sampling results from the outlets at issue, including specific measurements of constituent ions known to cause or contribute to impairment (i.e., sulfate, magnesium, calcium, and bicarbonate). *Id.* With conductivity as a proxy, discharges of such a mixture of ionic pollutants is actionable under the CWA, and a genuine issue of material fact remains as to whether Fola is liable under the CWA for these discharges.

### C. WVDEP included compliance with Water Quality Standards as an enforceable condition of Fola's NPDES permits.

Defendant next argues that it is shielded from liability because its NPDES permits do not specifically limit discharges of ionic pollutants, measured as conductivity. ECF No. 75 at 19. This argument was squarely addressed by the Court in *OVEC v. Marfork Coal Co., Inc.*, 966 F.Supp.2d 667, 682–86 (S.D. W.Va. 2013), where the Court made the unremarkable observation that "[t]he federal permit shield, as explained by the Fourth Circuit in *Piney Run*, requires compliance with all conditions of a permit." *Id.* at 680. Citizens as well as States may enforce conditions of a permit, including the narrative conditions of water quality standards. *See Northwest Envtl. Advocates v. City of Portland*, 56 F.3d 979, 988 (9th Cir. 1995) *cert. denied, City of Portland v. Northwest Envtl. Advocates*, 518 U.S. 1018 (1996) (explaining that "nothing in the language of the Clean Water Act, the legislative history, or the implementing regulations restricts citizens from enforcing the same conditions of a certificate or permit that a State may enforce. To the contrary . . . these sources uniformly support broad citizen enforcement authority, including the authority to enforce water quality standards.").

Here, WVDEP issued permits to Fola that incorporate by reference a regulation that prohibits discharges causing violations of water quality standards, W.Va. Code R. § 47-30-5.1.f,

and Plaintiffs allege violations of those standards. As thoroughly examined and discussed elsewhere, § 47-30-5.1.f as incorporated into permits by WVDEP is an enforceable permit condition. *Marfork*, 966 F. Supp. 2d at 985; *Fola*, 2013 WL 6709957, at *11; *Consol*, 2014 WL 1761938, at *3; *Alex Energy, Inc.*, 34 F. Supp. 3d at 637; *Elk Run*, 24 F. Supp. 3d at 537; *OVEC v. Fola Coal Co., LLC,* 2015 WL 362643, at *1 (S.D. W.Va. 2015). Because WVDEP included that enforceable permit condition in Fola's 2008 permits, the permit shield "explicitly authorizes the discharge of [pollutants] only to the extent that it does not cause a violation of water quality standards." *Marfork*, 966 F.Supp.2d at 685.

Furthermore, the Court is unmoved by Defendant's argument that the "language and structure" of its WV/NPDES permits suggest that water quality standards were not intended to be incorporated as a permit condition.[6] Whether boilerplate or not, WVDEP expressly incorporated § 47-30-5.1.f. into Defendant's reissued permits, and the Court is obligated to interpret "the terms of an NPDES permit using the principles of contract interpretation." *Marfork*, 966 F.Supp.2d at 682 (citing *Piney Run*, 268 F.3d at 269). Subsection 5.1.f. is itself unambiguous, and therefore must be enforced by the Court according to its plain meaning. *Marfork*, 966 F.Supp.2d at 682–83.

Importantly—and contrary to Defendant's view—such a reading is not inconsistent with the terms of the permit as a whole. Section A of Defendant's permits imposes numeric limits on the discharge of specific pollutants, and Section D provides associated monitoring and reporting

---

[6] More generally, the conclusion that incorporated water quality standards are enforceable permit conditions is in accord with "the statutory language, legislative history, and case law." *See Northwest Environmental Advocates v. City of Portland,* 56 F.3d 979 (9th Cir. 1995). *Northwest Environmental Advocates* was a citizen suit alleging violations of a condition of an Oregon NPDES permit, which provided that "no wastes shall be discharged and no activities shall be conducted which will violate Water Quality Standards." 56 F.3d at 985. The Ninth Circuit rejected the defendant's argument that Congress intended to foreclose citizen suit enforcement of water quality standards that were not translated into specific effluent limitations. *Id.* at 986. The court concluded that the legislative history reflects "Congress'[s] intention to grant *broad* authority for citizen enforcement," *id.* at 987, and "[t]he fact that Congress created a new, simpler enforcement method based on effluent limitations does not mean that Congress intended to foreclose citizen suit enforcement of water quality standards." *Id.* at 986. This Court agrees and finds that like Oregon, at the time of reissuance in 2008, West Virginia required permittees not to cause violations of water quality standards and that citizen suits may be used to enforce that condition.

requirements. Section D also reserves discretion and authority to modify specific numeric limits in the permit if deemed necessary to insure compliance with water quality standards. In the very least, that reservation of authority reminds us that WVDEP's permitting process is ultimately designed to ensure compliance with water quality standards. Consistent with Section D's reserve of authority, the incorporation of § 47-30-5.1.f. further operates to ensure compliance with water quality standards. It is perfectly sensible for WVDEP to at once reserve authority to modify specific effluent limits as necessary to ensure future compliance with water quality standards and also to require that permitees nevertheless meet water quality standards in the event that specific permit terms are otherwise inadequate.[7]

As observed by the EPA, "to include in the permit a list of every pollutant or combination of pollutants that conceivably might be contained in the applicant's wastestreams, and to determine which of those pollutants the Agency considered appropriate for discharge . . . would be an unduly burdensome and costly, and ultimately, impractical [permit-writing approach]." *In re Ketchikan Pulp Co.*, 7 E.A.D. 605 (EPA), Docket No. CWA 1089-12-22-309(g),1998 WL 284694, at *9 (May 15, 1998). In response, the EPA did not elect to *require* States to adopt such a comprehensive approach, but it also did not forbid States from doing so.[8] Through incorporating §

---

[7] Furthermore, such a course is consistent with the legislative history accompanying the 1972 CWA Amendments, wherein "nowhere does Congress evidence an intent to *preclude* the enforcement of water quality standards that have not been translated into effluent discharge limitations. The fact that Congress created a new, simpler enforcement method based on effluent limitations does not mean that Congress intended to foreclose citizen suit enforcement of water quality standards. In fact, the legislative history indicates just the opposite." *Northwest Envtl. Advocates v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995) *cert. denied, City of Portland v. Northwest Envtl. Advocates*, 518 U.S. 1018 (1996). The Senate Committee further explained that "[t]he standards are intended to function … [a]s a measure of performance . . . [and] to provide an avenue of legal action against polluters. If the wastes discharged by polluters reduce water quality below the standards, actions may be begun against the polluters." S.Rep.No. 414, 92nd Cong., 2nd Secc. 2 (1972) *reprinted in* 1972 U.S.C.C.A.N. 3668, 3671; 40 C.F.R. § 131.2 (1992).
[8] Considering agency recognition that water quality standards "often cannot be translated into effluent limitations," 1972 U.S.C.C.A.N. at 3675, the Ninth Circuit observed that "[c]itizen suits to enforce water quality standards effectuate complementary provisions of the CWA and the underlying purpose of the statute as a whole. Citizen suit enforcement of water quality standards is necessary to the effective enforcement of effluent limitations." *Northwest Envtl. Advocates v. City of Portland*, 56 F.3d 979, 989 (9th Cir. 1995) *cert. denied, City of Portland v. Northwest Envtl. Advocates*, 518 U.S. 1018 (1996).

-24-

47-30-5.1.f. into WV/NPDES permits, WVDEP has both avoided the practical pitfalls of writing comprehensive numeric limits into permits and also remained steadfast in requiring permittees to manage discharges in a way that ensures compliance with water quality standards. In so doing, WVDEP has indeed set a high bar for compliance,[9] but it is not the prerogative of this Court to ignore the plain terms of issued permits. Instead, it is the obligation of Defendant to meet the plainly stated conditions set out in its permit, and as above, a genuine issue of material fact remains as to whether Fola is liable under the CWA for its discharges, as alleged.

### D.  Evidence of impacts to fish is not necessary to prove the alleged violations

Defendant next argues that West Virginia law requires evidence of impacts to fish in order to prove a violation of narrative water quality standards, and because Plaintiffs have not done so, their claim must fail as a matter of law. ECF No. 75 at 35–37. Defendant's argument fails because (1) it misstates the evidentiary requirements and (2) it misrepresents Plaintiffs evidence. This Court thoroughly explored the question of whether fish impacts are required in order to show impairment of the narrative standard at 47 C.S.R. § 3.2 in *Elk Run*, 24 F.Supp.3d at 548–54. Neither the plain language of 47 C.S.R. § 3.2 nor any subsequent legislative resolutions have the legal effect of requiring proof of effects on fish in order to find a violation. *Id.* As applied here, though Plaintiffs apparently do not intend to present evidence of impacts to fish, Plaintiffs do represent an intent to introduce multiple lines of evidence showing impairment in violation of 47

---

[9] WVDEP is not alone is writing permits in a manner that requires compliance with a narrative condition prohibiting violations of water quality standards. At least Oregon, California, and Georgia have imposed comparable narrative conditions in NPDES permits, and courts have enforced those conditions. *Portland*, 56 F.3d at 985; *Bldg. Indus. Ass'n of San Diego Cnty. v. State Water Res. Control Bd.*, 124 Cal. App. 4th 866, 880 n. 10 (2004); *New Manchester Resort & Golf, LLC v. Douglasville Dev., LLC*, 734 F. Supp. 2d 1326, 1337 (N.D. Ga. 2010). Though Defendant has correctly noted contrary positions, none of the cited cases concern CWA liability under a permit that specifically integrates compliance with water quality standards as a permit condition. ECF No. 75 at 24; *see e.g., Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281 (6th Cir. 2015) (considering the scope of the permit shield as applied to a Kentucky NPDES permit that did not expressly integrate water quality standards as a permit condition). More to the point, whatever the approach of other state agencies, WVDEP is plainly within its authority in requiring something more than the federally prescribed regulatory floor.

C.S.R. § 3.2, including but not at all limited to, WVSCI scores. *See* ECF No. 71 at 8–9. Accordingly, Defendant is not entitled to judgment as a matter of law on this issue, and a genuine issue of material fact remains as to whether the instant waters are impaired and whether Defendant has complied with its permits.

### E. The WVDEP-imposed permit condition incorporating water quality standards to Fola's NPDES permits is enforceable.

Defendant also argues that a permit condition incorporating water quality standards as express effluent limitations is unenforceable via a citizen suit. This argument has been thoroughly addressed and rejected by the Court in *Fola Coal*, 2013 WL 6709957, at 18–19. As explained by the 11th Circuit,

> [T]he citizen-suit provision of the CWA gives federal courts an independent basis of jurisdiction. The relevant question is whether a state standard enacted pursuant to the CWA is "an effluent standard or limitation under this chapter."33 U.S.C. § 1365. On this question, the Supreme Court, although in dicta, has appeared to say yes, suggesting that citizens can sue under § 1365 regardless of whether the suit is based on standards promulgated by the EPA, or more stringent state standards that have received EPA approval. *E . P.A. v. California,* [426 U.S. 200, 224 (1976) ].

*Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1006–08 & n. 15 (11th Cir. 2004). Here, Plaintiffs' citizen suit is plainly within the ambit of 33 U.S.C. § 1365(a), and under that section, an "effluent standard or limitation" is an enforceable permit condition. Regulated entities are required under the CWA to comply with "any more stringent limitation, including those necessary to meet water quality standards . . . established pursuant to any State law or regulations." 33 U.S.C. § 1311(b)(1)(C); *see also* 33 U.S.C. § 1313(e)(3)(A). "The CWA requires that 'every permit contain (1) effluent limitations that reflect the pollution reduction achievable by using technologically practicable controls and (2) any more stringent pollutant release limitations necessary for the waterway receiving the pollutant to meet "water quality standards." ' " *Piney Run,* 268 F.3d at 265 (quoting *Am. Paper Inst. v. EPA,* 996 F.2d 346, 349 (D.C.Cir.1993) (citing 33 U.S.C. §

1311(b)(1)(C))); *see also id.* at 259–62 (involving citizen suit for enforcement of state water quality standards).

Moreover, all NPDES permits must comply "with the applicable water quality requirements of all affected States."40 C.F.R. § 122.4(d). As explained by the Supreme Court, "[t]his regulation effectively incorporates into federal law those state-law standards the Agency reasonably determines to be 'applicable.' In such a situation, then, state water quality standards promulgated by the States with substantial guidance from the EPA and approved by the Agency-are part of the federal law of water pollution control." *Arkansas v. Oklahoma,* 503 U.S. 91, 110 (1992) (footnote omitted). Thus, Defendant is again not entitled to judgment as a matter of law, as Plaintiffs are permitted to use the CWA's citizen suit provisions to seek enforcement of state water quality standards. *See also Swartz v. Beach,* 229 F.Supp.2d 1239, 1271 (D.Wyo.2002) ("[W]hen state standards are incorporated into a NPDES permit ... those standards are enforceable in a citizen suit under the CWA."(citing, among other cases, *Piney Run* )).

## V.    CONCLUSION

For the reasons explained above, Plaintiffs' Motion for Partial Summary Judgment on Jurisdictional Issues is **GRANTED** and Defendant's Motion for Summary Judgment is **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:       May 29, 2015

ROBERT C. CHAMBERS, CHIEF JUDGE